## EVERSON *v.* BOARD OF EDUCATION OF THE TOWNSHIP OF EWING ET AL.

No. 52.   Argued November 20, 1946.—Decided February 10, 1947.

*Edward R. Burke* and *E. Hilton Jackson* argued the cause for appellant. With *Mr. Burke* on the brief were *Challen B. Ellis, W. D. Jamieson* and *Kahl K. Spriggs.*

*William H. Speer* argued the cause for appellees. With him on the brief were *Porter R. Chandler* and *Roger R. Clisham.*

Briefs of *amici curiae* in support of appellant were filed by *E. Hilton Jackson* for the General Conference of Seventh-Day Adventists et al.; by *Harry V. Osborne, Kenneth W. Greenawalt* and *Whitney N. Seymour* for the American Civil Liberties Union; and by *Milton T. Lasher* for the State Council of the Junior Order of United American Mechanics of New Jersey.

Briefs of *amici curiae* in support of appellees were filed by *George F. Barrett,* Attorney General of Illinois, *William C. Wines,* Assistant Attorney General of Illinois, and *James A. Emmert,* Attorney General of Indiana, for the States of Illinois and Indiana; by *Fred S. LeBlanc,* Attorney General, for the State of Louisiana; by *Clarence A. Barnes,* Attorney General, for the Commonwealth of Massachusetts; by *Edmund E. Shepherd,* Solicitor General, and *Daniel J. O'Hara,* Assistant Attorney General, for the

State of Michigan; by *Nathaniel L. Goldstein,* Attorney General, and *Wendell P. Brown,* Solicitor General, for the State of New York; and by *James N. Vaughn* and *George E. Flood* for the National Council of Catholic Men et al.

MR. JUSTICE BLACK delivered the opinion of the Court.

A New Jersey statute authorizes its local school districts to make rules and contracts for the transportation of children to and from schools.[1] The appellee, a township board of education, acting pursuant to this statute, authorized reimbursement to parents of money expended by them for the bus transportation of their children on regular busses operated by the public transportation system. Part of this money was for the payment of transportation of some children in the community to Catholic parochial schools. These church schools give their students, in addition to secular education, regular religious instruction conforming to the religious tenets and modes of worship of the Catholic Faith. The superintendent of these schools is a Catholic priest.

The appellant, in his capacity as a district taxpayer, filed suit in a state court challenging the right of the Board to reimburse parents of parochial school students. He

---

[1] "Whenever in any district there are children living remote from any schoolhouse, the board of education of the district may make rules and contracts for the transportation of such children to and from school, including the transportation of school children to and from school other than a public school, except such school as is operated for profit in whole or in part.

"When any school district provides any transportation for public school children to and from school, transportation from any point in such established school route to any other point in such established school route shall be supplied to school children residing in such school district in going to and from school other than a public school, except such school as is operated for profit in whole or in part." New Jersey Laws, 1941, c. 191, p. 581; N. J. R. S. Cum. Supp., tit. 18, c. 14, § 8.

4

contended that the statute and the resolution passed pursuant to it violated both the State and the Federal Constitutions. That court held that the legislature was without power to authorize such payment under the state constitution. 132 N. J. L. 98, 39 A. 2d 75. The New Jersey Court of Errors and Appeals reversed, holding that neither the statute nor the resolution passed pursuant to it was in conflict with the State constitution or the provisions of the Federal Constitution in issue. 133 N. J. L. 350, 44 A. 2d 333. The case is here on appeal under 28 U. S. C. § 344 (a).

Since there has been no attack on the statute on the ground that a part of its language excludes children attending private schools operated for profit from enjoying State payment for their transportation, we need not consider this exclusionary language; it has no relevancy to any constitutional question here presented.[2]   Furthermore, if the exclusion clause had been properly challenged, we do not know whether New Jersey's highest court would construe its statutes as precluding payment of the school

[2] Appellant does not challenge the New Jersey statute or the resolution on the ground that either violates the equal protection clause of the Fourteenth Amendment by excluding payment for the transportation of any pupil who attends a "private school run for profit." Although the township resolution authorized reimbursement only for parents of public and Catholic school pupils, appellant does not allege, nor is there anything in the record which would offer the slightest support to an allegation, that there were any children in the township who attended or would have attended, but for want of transportation, any but public and Catholic schools.   It will be appropriate to consider the exclusion of students of private schools operated for profit when and if it is proved to have occurred, is made the basis of a suit by one in a position to challenge it, and New Jersey's highest court has ruled adversely to the challenger.   Striking down a state law is not a matter of such light moment that it should be done by a federal court *ex mero motu* on a postulate neither charged nor proved, but which rests on nothing but a possibility. *Cf. Liverpool, N. Y. & P. S. S. Co.* v. *Comm'rs of Emigration,* 113 U. S. 33, 39.

transportation of any group of pupils, even those of a private school run for profit.[3] Consequently, we put to one side the question as to the validity of the statute against the claim that it does not authorize payment for the transportation generally of school children in New Jersey.

The only contention here is that the state statute and the resolution, insofar as they authorized reimbursement to parents of children attending parochial schools, violate the Federal Constitution in these two respects, which to some extent overlap. *First.* They authorize the State to take by taxation the private property of some and bestow it upon others, to be used for their own private purposes. This, it is alleged, violates the due process clause of the Fourteenth Amendment. *Second.* The statute and the resolution forced inhabitants to pay taxes to help support and maintain schools which are dedicated to, and which regularly teach, the Catholic Faith. This is alleged to be a use of state power to support church schools contrary to the prohibition of the First Amendment which the Fourteenth Amendment made applicable to the states.

*First.* The due process argument that the state law taxes some people to help others carry out their private

---

[3] It might hold the excepting clause to be invalid, and sustain the statute with that clause excised. N. J. R. S., tit. 1, c. 1, § 10, provides with regard to any statute that if "any provision thereof, shall be declared to be unconstitutional . . . in whole or in part, by a court of competent jurisdiction, such . . . article . . . shall, to the extent that it is not unconstitutional, . . . be enforced . . . ." The opinion of the Court of Errors and Appeals in this very case suggests that state law now authorizes transportation of *all* pupils. Its opinion stated: "Since we hold that the legislature may appropriate general state funds or authorize the use of local funds for the transportation of pupils to *any* school, we conclude that such authorization of the use of local funds is likewise authorized by *Pamph. L.* 1941, *ch.* 191, and *R. S.* 18:7–78." 133 N. J. L. 350, 354, 44 A. 2d 333, 337. (Italics supplied.)

purposes is framed in two phases. The first phase is that a state cannot tax A to reimburse B for the cost of transporting his children to church schools. This is said to violate the due process clause because the children are sent to these church schools to satisfy the personal desires of their parents, rather than the public's interest in the general education of all children. This argument, if valid, would apply equally to prohibit state payment for the transportation of children to any non-public school, whether operated by a church or any other non-government individual or group. But, the New Jersey legislature has decided that a public purpose will be served by using tax-raised funds to pay the bus fares of all school children, including those who attend parochial schools. The New Jersey Court of Errors and Appeals has reached the same conclusion. The fact that a state law, passed to satisfy a public need, coincides with the personal desires of the individuals most directly affected is certainly an inadequate reason for us to say that a legislature has erroneously appraised the public need.

It is true that this Court has, in rare instances, struck down state statutes on the ground that the purpose for which tax-raised funds were to be expended was not a public one. *Loan Association* v. *Topeka,* 20 Wall. 655; *Parkersburg* v. *Brown,* 106 U. S. 487; *Thompson* v. *Consolidated Gas Utilities Corp.,* 300 U. S. 55. But the Court has also pointed out that this far-reaching authority must be exercised with the most extreme caution. *Green* v. *Frazier,* 253 U. S. 233, 240. Otherwise, a state's power to legislate for the public welfare might be seriously curtailed, a power which is a primary reason for the existence of states. Changing local conditions create new local problems which may lead a state's people and its local authorities to believe that laws authorizing new types of public services are necessary to promote the general well-being

of the people. The Fourteenth Amendment did not strip the states of their power to meet problems previously left for individual solution. *Davidson* v. *New Orleans,* 96 U. S. 97, 103–104; *Barbier* v. *Connolly,* 113 U. S. 27, 31–32; *Fallbrook Irrigation District* v. *Bradley,* 164 U. S. 112, 157–158.

It is much too late to argue that legislation intended to facilitate the opportunity of children to get a secular education serves no public purpose. *Cochran* v. *Louisiana State Board of Education,* 281 U. S. 370; Holmes, J., in *Interstate Ry.* v. *Massachusetts,* 207 U. S. 79, 87. See opinion of Cooley, J., in *Stuart* v. *School District No. 1 of Kalamazoo,* 30 Mich. 69 (1874). The same thing is no less true of legislation to reimburse needy parents, or all parents, for payment of the fares of their children so that they can ride in public busses to and from schools rather than run the risk of traffic and other hazards incident to walking or "hitchhiking." See *Barbier* v. *Connolly, supra,* at 31. See also cases collected 63 A. L. R. 413; 118 A. L. R. 806. Nor does it follow that a law has a private rather than a public purpose because it provides that tax-raised funds will be paid to reimburse individuals on account of money spent by them in a way which furthers a public program. See *Carmichael* v. *Southern Coal & Coke Co.,* 301 U. S. 495, 518. Subsidies and loans to individuals such as farmers and home-owners, and to privately owned transportation systems, as well as many other kinds of businesses, have been commonplace practices in our state and national history.

Insofar as the second phase of the due process argument may differ from the first, it is by suggesting that taxation for transportation of children to church schools constitutes support of a religion by the State. But if the law is invalid for this reason, it is because it violates the First Amendment's prohibition against the establishment of religion

8

by law. This is the exact question raised by appellant's second contention, to consideration of which we now turn.

*Second.* The New Jersey statute is challenged as a "law respecting an establishment of religion." The First Amendment, as made applicable to the states by the Fourteenth, *Murdock* v. *Pennsylvania,* 319 U. S. 105, commands that a state "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." These words of the First Amendment reflected in the minds of early Americans a vivid mental picture of conditions and practices which they fervently wished to stamp out in order to preserve liberty for themselves and for their posterity. Doubtless their goal has not been entirely reached; but so far has the Nation moved toward it that the expression "law respecting an establishment of religion," probably does not so vividly remind present-day Americans of the evils, fears, and political problems that caused that expression to be written into our Bill of Rights. Whether this New Jersey law is one respecting an "establishment of religion" requires an understanding of the meaning of that language, particularly with respect to the imposition of taxes. Once again,[4] therefore, it is not inappropriate briefly to review the background and environment of the period in which that constitutional language was fashioned and adopted.

A large proportion of the early settlers of this country came here from Europe to escape the bondage of laws which compelled them to support and attend government-favored churches. The centuries immediately before and contemporaneous with the colonization of America had been filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to

---

[4] See *Reynolds* v. *United States,* 98 U. S. 145, 162; *cf. Knowlton* v. *Moore,* 178 U. S. 41, 89, 106.

maintain their absolute political and religious supremacy. With the power of government supporting them, at various times and places, Catholics had persecuted Protestants, Protestants had persecuted Catholics, Protestant sects had persecuted other Protestant sects, Catholics of one shade of belief had persecuted Catholics of another shade of belief, and all of these had from time to time persecuted Jews. In efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed. Among the offenses for which these punishments had been inflicted were such things as speaking disrespectfully of the views of ministers of government-established churches, non-attendance at those churches, expressions of non-belief in their doctrines, and failure to pay taxes and tithes to support them.[5]

These practices of the old world were transplanted to and began to thrive in the soil of the new America. The very charters granted by the English Crown to the individuals and companies designated to make the laws which would control the destinies of the colonials authorized these individuals and companies to erect religious establishments which all, whether believers or non-believers, would be required to support and attend.[6] An exercise of

---

[5] See *e. g.* Macaulay, History of England (1849) I, cc. 2, 4; The Cambridge Modern History (1908) V, cc. V, IX, XI; Beard, Rise of American Civilization (1933) I, 60; Cobb, Rise of Religious Liberty in America (1902) c. II; Sweet, The Story of Religion in America (1939) c. II; Sweet, Religion in Colonial America (1942) 320–322.

[6] See *e. g.* the charter of the colony of Carolina which gave the grantees the right of "patronage and advowsons of all the churches and chapels . . . together with licence and power to build and found churches, chapels and oratories . . . and to cause them to be dedicated and consecrated, according to the ecclesiastical laws of our kingdom of England." Poore, Constitutions (1878) II, 1390, 1391. That of Maryland gave to the grantee Lord Baltimore "the Patronages, and

this authority was accompanied by a repetition of many of the old-world practices and persecutions. Catholics found themselves hounded and proscribed because of their faith; Quakers who followed their conscience went to jail; Baptists were peculiarly obnoxious to certain dominant Protestant sects; men and women of varied faiths who happened to be in a minority in a particular locality were persecuted because they steadfastly persisted in worshipping God only as their own consciences dictated.[7] And all of these dissenters were compelled to pay tithes and taxes [8] to support government-sponsored churches whose ministers preached inflammatory sermons designed to strengthen and consolidate the established faith by generating a burning hatred against dissenters.

Advowsons of all Churches which . . . shall happen to be built, together with Licence and Faculty of erecting and founding Churches, Chapels, and Places of Worship . . . and of causing the same to be dedicated and consecrated according to the Ecclesiastical Laws of our Kingdom of *England,* with all, and singular such, and as ample Rights, Jurisdictions, Privileges, . . . as any Bishop . . . in our Kingdom of *England,* ever . . . hath had . . . ." MacDonald, Documentary Source Book of American History (1934) 31, 33. The Commission of New Hampshire of 1680, Poore, *supra,* II, 1277, stated: "And above all things We do by these presents will, require and comand our said Councill to take all possible care for ye discountenancing of vice and encouraging of virtue and good living; and that by such examples ye infidle may be invited and desire to partake of ye Christian Religion, and for ye greater ease and satisfaction of ye sd loving subjects in matters of religion, We do hereby require and comand yt liberty of conscience shall be allowed unto all protestants; yt such especially as shall be conformable to ye rites of ye Church of Engd shall be particularly countenanced and encouraged." See also *Pawlet* v. *Clark,* 9 Cranch 292.

[7] See *e. g.* Semple, Baptists in Virginia (1894); Sweet, Religion in Colonial America, *supra* at 131–152, 322–339.

[8] Almost every colony exacted some kind of tax for church support. See *e. g.* Cobb, op. cit. *supra, note* 5, 110 (Virginia); 131 (North Carolina); 169 (Massachusetts); 270 (Connecticut); 304, 310, 339 (New York); 386 (Maryland); 295 (New Hampshire).

These practices became so commonplace as to shock the freedom-loving colonials into a feeling of abhorrence.[9] The imposition of taxes to pay ministers' salaries and to build and maintain churches and church property aroused their indignation.[10] It was these feelings which found expression in the First Amendment. No one locality and no one group throughout the Colonies can rightly be given entire credit for having aroused the sentiment that culminated in adoption of the Bill of Rights' provisions embracing religious liberty. But Virginia, where the established church had achieved a dominant influence in political affairs and where many excesses attracted wide public attention, provided a great stimulus and able leadership for the movement. The people there, as elsewhere, reached the conviction that individual religious liberty could be achieved best under a government which was stripped of all power to tax, to support, or otherwise to assist any or all religions, or to interfere with the beliefs of any religious individual or group.

The movement toward this end reached its dramatic climax in Virginia in 1785–86 when the Virginia legislative body was about to renew Virginia's tax levy for the support of the established church. Thomas Jeffer-

---

[9] Madison wrote to a friend in 1774: "That diabolical, hell-conceived principle of persecution rages among some . . . This vexes me the worst of anything whatever. There are at this time in the adjacent country not less than five or six well-meaning men in close jail for publishing their religious sentiments, which in the main are very orthodox. I have neither patience to hear, talk, or think of anything relative to this matter; for I have squabbled and scolded, abused and ridiculed, so long about it to little purpose, that I am without common patience. So I must beg you to pity me, and pray for liberty of conscience to all." I Writings of James Madison (1900) 18, 21.

[10] Virginia's resistance to taxation for church support was crystallized in the famous "Parsons' Cause" argued by Patrick Henry in 1763. For an account see Cobb, *op. cit., supra*, note 5, 108–111.

son and James Madison led the fight against this tax.
Madison wrote his great Memorial and Remonstrance
against the law.[11]  In it, he eloquently argued that a
true religion did not need the support of law; that no
person, either believer or non-believer, should be taxed
to support a religious institution of any kind; that the
best interest of a society required that the minds of men
always be wholly free; and that cruel persecutions were
the inevitable result of government-established religions.
Madison's Remonstrance received strong support through-
out Virginia,[12] and the Assembly postponed consideration
of the proposed tax measure until its next session.   When
the proposal came up for consideration at that session, it
not only died in committee, but the Assembly enacted
the famous "Virginia Bill for Religious Liberty" originally
written by Thomas Jefferson.[13]   The preamble to that Bill
stated among other things that

> "Almighty God hath created the mind free; that
> all attempts to influence it by temporal punishments
> or burthens, or by civil incapacitations, tend only
> to beget habits of hypocrisy and meanness, and are

---

[11] II Writings of James Madison, 183.

[12] In a recently discovered collection of Madison's papers, Madison
recollected that his Remonstrance "met with the approbation of the
Baptists, the Presbyterians, the Quakers, and the few Roman Cath-
olics, universally; of the Methodists in part; and even of not a few
of the Sect formerly established by law." Madison, *Monopolies,
Perpetuities, Corporations, Ecclesiastical Endowments*, in Fleet, *Mad-
ison's "Detached Memorandum,"* 3 William and Mary Q. (1946) 534,
551, 555.

[13] For accounts of background and evolution of the Virginia Bill for
Religious Liberty see *e. g.* James, The Struggle for Religious Liberty in
Virginia (1900); Thom, The Struggle for Religious Freedom in Vir-
ginia: The Baptists (1900); Cobb, *op. cit., supra,* note 5, 74–115;
Madison, *Monopolies, Perpetuities, Corporations, Ecclesiastical En-
dowments, op. cit., supra,* note 12, 554, 556.

> a departure from the plan of the Holy author of our religion, who being Lord both of body and mind, yet chose not to propagate it by coercions on either . . .; that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical; that even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern . . . ."

And the statute itself enacted

> "That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief . . . ." [14]

This Court has previously recognized that the provisions of the First Amendment, in the drafting and adoption of which Madison and Jefferson played such leading roles, had the same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute. *Reynolds* v. *United States, supra* at 164; *Watson* v. *Jones,* 13 Wall. 679; *Davis* v. *Beason,* 133 U. S. 333, 342. Prior to the adoption of the Fourteenth Amendment, the First Amendment did not apply as a restraint against the states.[15] Most of them did soon provide similar constitutional protections

---

[14] 12 Hening, Statutes of Virginia (1823) 84; Commager, Documents of American History (1944) 125.

[15] *Permoli* v. *New Orleans,* 3 How. 589. *Cf. Barron* v. *Baltimore,* 7 Pet. 243.

for religious liberty.[16]    But some states persisted for about half a century in imposing restraints upon the free exercise of religion and in discriminating against particular religious groups.[17]    In recent years, so far as the provision against the establishment of a religion is concerned, the question has most frequently arisen in connection with proposed state aid to church schools and efforts to carry on religious teachings in the public schools in accordance with the tenets of a particular sect.[18]    Some churches have either sought or accepted state financial support for their schools.    Here again the efforts to obtain state aid or acceptance of it have not been limited to any one particular faith.[19]    The state courts, in the main, have remained faithful to the language of their own constitutional provisions designed to protect religious freedom and to separate religions and governments.    Their decisions, however, show the difficulty in drawing the line between tax legislation which provides funds for the welfare of the general public and that which is designed to support institutions which teach religion.[20]

The meaning and scope of the First Amendment, preventing establishment of religion or prohibiting the free exercise thereof, in the light of its history and the evils it

---

[16] For a collection of state constitutional provisions on freedom of religion see Gabel, Public Funds for Church and Private Schools (1937) 148–149.   See also 2 Cooley, Constitutional Limitations (1927) 960–985.

[17] Test provisions forbade officeholders to "deny . . . the truth of the Protestant religion," e. g. Constitution of North Carolina (1776) § XXXII, II Poore, supra, 1413.   Maryland permitted taxation for support of the Christian religion and limited civil office to Christians until 1818, id., I, 819, 820, 832.

[18] See Note 50 Yale L. J. (1941) 917; see also cases collected 14 L. R. A. 418; 5 A. L. R. 879; 141 A. L. R. 1148.

[19] See cases collected 14 L. R. A. 418; 5 A. L. R. 879; 141 A. L. R. 1148.

[20] Ibid.   See also Cooley, op. cit., supra, note 16.

was designed forever to suppress, have been several times elaborated by the decisions of this Court prior to the application of the First Amendment to the states by the Fourteenth.[21] The broad meaning given the Amendment by these earlier cases has been accepted by this Court in its decisions concerning an individual's religious freedom rendered since the Fourteenth Amendment was interpreted to make the prohibitions of the First applicable to state action abridging religious freedom.[22] There is every reason to give the same application and broad interpretation to the "establishment of religion" clause. The interrelation of these complementary clauses was well summarized in a statement of the Court of Appeals of South Carolina,[23] quoted with approval by this Court in *Watson* v. *Jones,* 13 Wall. 679, 730: "The structure of our government has, for the preservation of civil liberty, rescued the temporal institutions from religious interference. On the other hand, it has secured religious liberty from the invasion of the civil authority."

The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertain-

---

[21] *Terrett* v. *Taylor,* 9 Cranch 43; *Watson* v. *Jones,* 13 Wall. 679; *Davis* v. *Beason,* 133 U. S. 333; *Cf. Reynolds* v. *United States, supra,* 162; *Reuben Quick Bear* v. *Leupp,* 210 U. S. 50.

[22] *Cantwell* v. *Connecticut,* 310 U. S. 296; *Jamison* v. *Texas,* 318 U. S. 413; *Largent* v. *Texas,* 318 U. S. 418; *Murdock* v. *Pennsylvania, supra;* *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624; *Follett* v. *McCormick,* 321 U. S. 573; *Marsh* v. *Alabama,* 326 U. S. 501. *Cf. Bradfield* v. *Roberts,* 175 U. S. 291.

[23] *Harmon* v. *Dreher,* Speer's Equity Reports (S. C., 1843), 87, 120.

ing or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.* In the words of Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between church and State." *Reynolds* v. *United States, supra* at 164.

We must consider the New Jersey statute in accordance with the foregoing limitations imposed by the First Amendment. But we must not strike that state statute down if it is within the State's constitutional power even though it approaches the verge of that power. See *Interstate Ry.* v. *Massachusetts,* Holmes, J., *supra* at 85, 88. New Jersey cannot consistently with the "establishment of religion" clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church. On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation. While we do not mean to intimate that a state could not provide transportation only to children attending public schools, we must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general state law benefits to all its citizens without regard to their religious belief.

Measured by these standards, we cannot say that the First Amendment prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools. It is undoubtedly true that children are helped to get to church schools. There is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets when transportation to a public school would have been paid for by the State. The same possibility exists where the state requires a local transit company to provide reduced fares to school children including those attending parochial schools,[24] or where a municipally owned transportation system undertakes to carry all school children free of charge. Moreover, state-paid policemen, detailed to protect children going to and from church schools from the very real hazards of traffic, would serve much the same purpose and accomplish much the same result as state provisions intended to guarantee free transportation of a kind which the state deems to be best for the school children's welfare. And parents might refuse to risk their children to the serious danger of traffic accidents going to and from parochial schools, the approaches to which were not protected by policemen. Similarly, parents might be reluctant to permit their children to attend schools which the state had cut off from such general government services as ordinary police and fire protection, connections for sewage disposal, public

[24] New Jersey long ago permitted public utilities to charge school children reduced rates. See *Public S. R. Co.* v. *Public Utility Comm'rs,* 81 N. J. L. 363, 80 A. 27 (1911); see also *Interstate Ry.* v. *Massachusetts, supra.* The District of Columbia Code requires that the new charter of the District public transportation company provide a three-cent fare "for school children . . . going to and from public, parochial, or like schools . . . ." 47 Stat. 752, 759.

highways and sidewalks. Of course, cutting off church schools from these services, so separate and so indisputably marked off from the religious function, would make it far more difficult for the schools to operate. But such is obviously not the purpose of the First Amendment. That Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them.

This Court has said that parents may, in the discharge of their duty under state compulsory education laws, send their children to a religious rather than a public school if the school meets the secular educational requirements which the state has power to impose. See *Pierce* v. *Society of Sisters,* 268 U. S. 510. It appears that these parochial schools meet New Jersey's requirements. The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools.

The First Amendment has erected a wall between church and state. That wall must be kept high and impregnable. We could not approve the slightest breach. New Jersey has not breached it here.

*Affirmed.*

Mr. Justice Jackson, dissenting.

I find myself, contrary to first impressions, unable to join in this decision. I have a sympathy, though it is not ideological, with Catholic citizens who are compelled by law to pay taxes for public schools, and also feel constrained by conscience and discipline to support other schools for their own children. Such relief to them as

this case involves is not in itself a serious burden to tax-
payers and I had assumed it to be as little serious in
principle.  Study of this case convinces me otherwise.
The Court's opinion marshals every argument in favor
of state aid and puts the case in its most favorable light,
but much of its reasoning confirms my conclusions that
there are no good grounds upon which to support the pres-
ent legislation.  In fact, the undertones of the opinion,
advocating complete and uncompromising separation of
Church from State, seem utterly discordant with its con-
clusion yielding support to their commingling in educa-
tional matters.  The case which irresistibly comes to mind
as the most fitting precedent is that of Julia who, according
to Byron's reports, "whispering 'I will ne'er consent,'—
consented."

### I.

The Court sustains this legislation by assuming two
deviations from the facts of this particular case; first, it
assumes a state of facts the record does not support, and
secondly, it refuses to consider facts which are inescapable
on the record.

The Court concludes that this "legislation, as applied,
does no more than provide a general program to help par-
ents get their children, regardless of their religion, safely
and expeditiously to and from accredited schools," and it
draws a comparison between "state provisions intended to
guarantee free transportation" for school children with
services such as police and fire protection, and implies that
we are here dealing with "laws authorizing new types of
public services . . . ."  This hypothesis permeates the
opinion.  The facts will not bear that construction.

The Township of Ewing is not furnishing transportation
to the children in any form; it is not operating school
busses itself or contracting for their operation; and it is
not performing any public service of any kind with this

taxpayer's money. All school children are left to ride as ordinary paying passengers on the regular busses operated by the public transportation system. What the Township does, and what the taxpayer complains of, is at stated intervals to reimburse parents for the fares paid, provided the children attend either public schools or Catholic Church schools. This expenditure of tax funds has no possible effect on the child's safety or expedition in transit. As passengers on the public busses they travel as fast and no faster, and are as safe and no safer, since their parents are reimbursed as before.

In addition to thus assuming a type of service that does not exist, the Court also insists that we must close our eyes to a discrimination which does exist. The resolution which authorizes disbursement of this taxpayer's money limits reimbursement to those who attend public schools and Catholic schools. That is the way the Act is applied to this taxpayer.

The New Jersey Act in question makes the character of the school, not the needs of the children, determine the eligibility of parents to reimbursement. The Act permits payment for transportation to parochial schools or public schools but prohibits it to private schools operated in whole or in part for profit. Children often are sent to private schools because their parents feel that they require more individual instruction than public schools can provide, or because they are backward or defective and need special attention. If all children of the state were objects of impartial solicitude, no reason is obvious for denying transportation reimbursement to students of this class, for these often are as needy and as worthy as those who go to public or parochial schools. Refusal to reimburse those who attend such schools is understandable only in the light of a purpose to aid the schools, because the state might well abstain from aiding a profit-making private enterprise. Thus, under the Act

and resolution brought to us by this case, children are classified according to the schools they attend and are to be aided if they attend the public schools or private Catholic schools, and they are not allowed to be aided if they attend private secular schools or private religious schools of other faiths.

Of course, this case is not one of a Baptist or a Jew or an Episcopalian or a pupil of a private school complaining of discrimination. It is one of a taxpayer urging that he is being taxed for an unconstitutional purpose. I think he is entitled to have us consider the Act just as it is written. The statement by the New Jersey court that it holds the Legislature may authorize use of local funds "for the transportation of pupils to any school," 133 N. J. L. 350, 354, 44 A. 2d 333, 337, in view of the other constitutional views expressed, is not a holding that this Act authorizes transportation of *all* pupils to *all* schools. As applied to this taxpayer by the action he complains of, certainly the Act does not authorize reimbursement to those who choose any alternative to the public school except Catholic Church schools.

If we are to decide this case on the facts before us, our question is simply this: Is it constitutional to tax this complainant to pay the cost of carrying pupils to Church schools of one specified denomination?

## II.

Whether the taxpayer constitutionally can be made to contribute aid to parents of students because of their attendance at parochial schools depends upon the nature of those schools and their relation to the Church. The Constitution says nothing of education. It lays no obligation on the states to provide schools and does not undertake to regulate state systems of education if they see fit to maintain them. But they cannot, through school policy any more than through other means, invade rights secured

to citizens by the Constitution of the United States. *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624. One of our basic rights is to be free of taxation to support a transgression of the constitutional command that the authorities "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U. S. Const., Amend. I; *Cantwell* v. *Connecticut,* 310 U. S. 296.

The function of the Church school is a subject on which this record is meager. It shows only that the schools are under superintendence of a priest and that "religion is taught as part of the curriculum." But we know that such schools are parochial only in name—they, in fact, represent a world-wide and age-old policy of the Roman Catholic Church. Under the rubric "Catholic Schools," the Canon Law of the Church, by which all Catholics are bound, provides:

"1215. Catholic children are to be educated in schools where not only nothing contrary to Catholic faith and morals is taught, but rather in schools where religious and moral training occupy the first place. . . . (Canon 1372.)"

"1216. In every elementary school the children must, according to their age, be instructed in Christian doctrine.

"The young people who attend the higher schools are to receive a deeper religious knowledge, and the bishops shall appoint priests qualified for such work by their learning and piety. (Canon 1373.)"

"1217. Catholic children shall not attend non-Catholic, indifferent, schools that are mixed, that is to say, schools open to Catholics and non-Catholics alike. The bishop of the diocese only has the right, in harmony with the instructions of the Holy See, to decide under what circumstances, and with what safe-

guards to prevent loss of faith, it may be tolerated that Catholic children go to such schools. (Canon 1374.)"

"1224. The religious teaching of youth in any schools is subject to the authority and inspection of the Church.

"The local Ordinaries have the right and duty to watch that nothing is taught contrary to faith or good morals, in any of the schools of their territory.

"They, moreover, have the right to approve the books of Christian doctrine and the teachers of religion, and to demand, for the sake of safeguarding religion and morals, the removal of teachers and books. (Canon 1381.)" (Woywod, Rev. Stanislaus, The New Canon Law, under imprimatur of Most Rev. Francis J. Spellman, Archbishop of New York and others, 1940.)

It is no exaggeration to say that the whole historic conflict in temporal policy between the Catholic Church and non-Catholics comes to a focus in their respective school policies. The Roman Catholic Church, counseled by experience in many ages and many lands and with all sorts and conditions of men, takes what, from the viewpoint of its own progress and the success of its mission, is a wise estimate of the importance of education to religion. It does not leave the individual to pick up religion by chance. It relies on early and indelible indoctrination in the faith and order of the Church by the word and example of persons consecrated to the task.

Our public school, if not a product of Protestantism, at least is more consistent with it than with the Catholic culture and scheme of values. It is a relatively recent development dating from about 1840.[1] It is organized on

---

[1] See Cubberley, Public Education in the United States (1934) ch. VI; Knight, Education in the United States (1941) ch. VIII.

24

the premise that secular education can be isolated from all religious teaching so that the school can inculcate all needed temporal knowledge and also maintain a strict and lofty neutrality as to religion. The assumption is that after the individual has been instructed in worldly wisdom he will be better fitted to choose his religion. Whether such a disjunction is possible, and if possible whether it is wise, are questions I need not try to answer.

I should be surprised if any Catholic would deny that the parochial school is a vital, if not the most vital, part of the Roman Catholic Church. If put to the choice, that venerable institution, I should expect, would forego its whole service for mature persons before it would give up education of the young, and it would be a wise choice. Its growth and cohesion, discipline and loyalty, spring from its schools. Catholic education is the rock on which the whole structure rests, and to render tax aid to its Church school is indistinguishable to me from rendering the same aid to the Church itself.

### III.

It is of no importance in this situation whether the beneficiary of this expenditure of tax-raised funds is primarily the parochial school and incidentally the pupil, or whether the aid is directly bestowed on the pupil with indirect benefits to the school. The state cannot maintain a Church and it can no more tax its citizens to furnish free carriage to those who attend a Church. The prohibition against establishment of religion cannot be circumvented by a subsidy, bonus or reimbursement of expense to individuals for receiving religious instruction and indoctrination.

The Court, however, compares this to other subsidies and loans to individuals and says, "Nor does it follow that a law has a private rather than a public purpose because

it provides that tax-raised funds will be paid to reimburse individuals on account of money spent by them in a way which furthers a public program. See *Carmichael* v. *Southern Coal & Coke Co.*, 301 U. S. 495, 518." Of course, the state may pay out tax-raised funds to relieve pauperism, but it may not under our Constitution do so to induce or reward piety. It may spend funds to secure old age against want, but it may not spend funds to secure religion against skepticism. It may compensate individuals for loss of employment, but it cannot compensate them for adherence to a creed.

It seems to me that the basic fallacy in the Court's reasoning, which accounts for its failure to apply the principles it avows, is in ignoring the essentially religious test by which beneficiaries of this expenditure are selected. A policeman protects a Catholic, of course—but not because he is a Catholic; it is because he is a man and a member of our society. The fireman protects the Church school—but not because it is a Church school; it is because it is property, part of the assets of our society. Neither the fireman nor the policeman has to ask before he renders aid "Is this man or building identified with the Catholic Church?" But before these school authorities draw a check to reimburse for a student's fare they must ask just that question, and if the school is a Catholic one they may render aid because it is such, while if it is of any other faith or is run for profit, the help must be withheld. To consider the converse of the Court's reasoning will best disclose its fallacy. That there is no parallel between police and fire protection and this plan of reimbursement is apparent from the incongruity of the limitation of this Act if applied to police and fire service. Could we sustain an Act that said the police shall protect pupils on the way to or from public schools and Catholic schools but not

while going to and coming from other schools, and firemen shall extinguish a blaze in public or Catholic school buildings but shall not put out a blaze in Protestant Church schools or private schools operated for profit? That is the true analogy to the case we have before us and I should think it pretty plain that such a scheme would not be valid.

The Court's holding is that this taxpayer has no grievance because the state has decided to make the reimbursement a public purpose and therefore we are bound to regard it as such. I agree that this Court has left, and always should leave to each state, great latitude in deciding for itself, in the light of its own conditions, what shall be public purposes in its scheme of things. It may socialize utilities and economic enterprises and make taxpayers' business out of what conventionally had been private business. It may make public business of individual welfare, health, education, entertainment or security. But it cannot make public business of religious worship or instruction, or of attendance at religious institutions of any character. There is no answer to the proposition, more fully expounded by MR. JUSTICE RUTLEDGE, that the effect of the religious freedom Amendment to our Constitution was to take every form of propagation of religion out of the realm of things which could directly or indirectly be made public business and thereby be supported in whole or in part at taxpayers' expense. That is a difference which the Constitution sets up between religion and almost every other subject matter of legislation, a difference which goes to the very root of religious freedom and which the Court is overlooking today. This freedom was first in the Bill of Rights because it was first in the forefathers' minds; it was set forth in absolute terms, and its strength is its rigidity. It was intended not only to keep the states' hands out of religion, but to

keep religion's hands off the state, and, above all, to keep bitter religious controversy out of public life by denying to every denomination any advantage from getting control of public policy or the public purse. Those great ends I cannot but think are immeasurably compromised by today's decision.

This policy of our Federal Constitution has never been wholly pleasing to most religious groups. They all are quick to invoke its protections; they all are irked when they feel its restraints. This Court has gone a long way, if not an unreasonable way, to hold that public business of such paramount importance as maintenance of public order, protection of the privacy of the home, and taxation may not be pursued by a state in a way that even indirectly will interfere with religious proselyting. See dissent in *Douglas* v. *Jeannette,* 319 U. S. 157, 166; *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Martin* v. *Struthers,* 319 U. S. 141; *Jones* v. *Opelika,* 316 U. S. 584, reversed on rehearing, 319 U. S. 103.

But we cannot have it both ways. Religious teaching cannot be a private affair when the state seeks to impose regulations which infringe on it indirectly, and a public affair when it comes to taxing citizens of one faith to aid another, or those of no faith to aid all. If these principles seem harsh in prohibiting aid to Catholic education, it must not be forgotten that it is the same Constitution that alone assures Catholics the right to maintain these schools at all when predominant local sentiment would forbid them. *Pierce* v. *Society of Sisters,* 268 U. S. 510. Nor should I think that those who have done so well without this aid would want to see this separation between Church and State broken down. If the state may aid these religious schools, it may therefore regulate them. Many groups have sought aid from tax funds only to find that it carried political controls with it. Indeed this Court has

declared that "It is hardly lack of due process for the Government to regulate that which it subsidizes." *Wickard* v. *Filburn,* 317 U. S. 111, 131.

But in any event, the great purposes of the Constitution do not depend on the approval or convenience of those they restrain. I cannot read the history of the struggle to separate political from ecclesiastical affairs, well summarized in the opinion of MR. JUSTICE RUTLEDGE in which I generally concur, without a conviction that the Court today is unconsciously giving the clock's hands a backward turn.

MR. JUSTICE FRANKFURTER joins in this opinion.

MR. JUSTICE RUTLEDGE, with whom MR. JUSTICE FRANKFURTER, MR. JUSTICE JACKSON and MR. JUSTICE BURTON agree, dissenting.

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U. S. Const., Amend. I.

---

"Well aware that Almighty God hath created the mind free; . . . that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical; . . . .

"*We, the General Assembly, do enact,* That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer, on account of his religious opinions or belief . . . ." [1]

---

[1] "A Bill for Establishing Religious Freedom," enacted by the General Assembly of Virginia, January 19, 1786. See 1 Randall, The Life of Thomas Jefferson (1858) 219–220; XII Hening's Statutes of Virginia (1823) 84.

I cannot believe that the great author of those words, or the men who made them law, could have joined in this decision. Neither so high nor so impregnable today as yesterday is the wall raised between church and state by Virginia's great statute of religious freedom and the First Amendment, now made applicable to all the states by the Fourteenth.[2] New Jersey's statute sustained is the first, if indeed it is not the second breach to be made by this Court's action. That a third, and a fourth, and still others will be attempted, we may be sure. For just as *Cochran* v. *Board of Education,* 281 U. S. 370, has opened the way by oblique ruling[3] for this decision, so will the two make wider the breach for a third. Thus with time the most solid freedom steadily gives way before continuing corrosive decision.

This case forces us to determine squarely for the first time[4] what was "an establishment of religion" in the First Amendment's conception; and by that measure to decide whether New Jersey's action violates its command. The facts may be stated shortly, to give setting and color to the constitutional problem.

By statute New Jersey has authorized local boards of education to provide for the transportation of children "to and from school other than a public school" except one

[2] *Schneider* v. *State,* 308 U. S. 147; *Cantwell* v. *Connecticut,* 310 U. S. 296; *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Prince* v. *Massachusetts,* 321 U. S. 158; *Thomas* v. *Collins,* 323 U. S. 516, 530.

[3] The briefs did not raise the First Amendment issue. The only one presented was whether the state's action involved a public or an exclusively private function under the due process clause of the Fourteenth Amendment. See Part IV *infra.* On the facts, the cost of transportation here is inseparable from both religious and secular teaching at the religious school. In the *Cochran* case the state furnished secular textbooks only. But see text *infra* at note 40 *et seq.,* and Part IV.

[4] Cf. note 3 and text Part IV; see also note 35.

operated for profit wholly or in part, over established
public school routes, or by other means when the child
lives "remote from any school." [5]   The school board of
Ewing Township has provided by resolution for "the trans-
portation of pupils of Ewing to the Trenton and Penning-
ton High Schools and Catholic Schools by way of public
carrier . . . ." [6]

Named parents have paid the cost of public conveyance
of their children from their homes in Ewing to three public
high schools and four parochial schools outside the dis-
trict. [7]  Semiannually the Board has reimbursed the
parents from public school funds raised by general taxa-
tion.   Religion is taught as part of the curriculum in each

---

[5] The statute reads: "Whenever in any district there are children
living remote from any schoolhouse, the board of education of the
district may make rules and contracts for the transportation of such
children to and from school . . . other than a public school, except
such school as is operated for profit in whole or in part.

"When any school district provides any transportation for public
school children to and from school, transportation from any point in
such established school route to any other point in such established
school route shall be supplied to school children residing in such school
district in going to and from school other than a public school, except
such school as is operated for profit in whole or in part."   Laws of
New Jersey (1941) c. 191.

[6] The full text of the resolution is given in note 59 *infra*.

[7] The public schools attended were the Trenton Senior High School,
the Trenton Junior High School and the Pennington High School.
Ewing Township itself provides no public high schools, affording only
elementary public schools which stop with the eighth grade.   The
Ewing school board pays for both transportation and tuitions of pupils
attending the public high schools.   The only private schools, all
Catholic, covered in application of the resolution are St. Mary's
Cathedral High School, Trenton Catholic Boys High School, and
two elementary parochial schools, St. Hedwig's Parochial School and
St. Francis School.   The Ewing board pays only for transportation
to these schools, not for tuitions.   So far as the record discloses, the
board does not pay for or provide transportation to any other ele-
mentary school, public or private.   See notes 58, 59 and text *infra*.

of the four private schools, as appears affirmatively by the testimony of the superintendent of parochial schools in the Diocese of Trenton.

The Court of Errors and Appeals of New Jersey, reversing the Supreme Court's decision, 132 N. J. L. 98, 39 A. 2d 75, has held the Ewing board's action not in contravention of the state constitution or statutes or of the Federal Constitution. 133 N. J. L. 350, 44 A. 2d 333. We have to consider only whether this ruling accords with the prohibition of the First Amendment implied in the due process clause of the Fourteenth.

## I.

Not simply an established church, but any law respecting an establishment of religion is forbidden. The Amendment was broadly but not loosely phrased. It is the compact and exact summation of its author's views formed during his long struggle for religious freedom. In Madison's own words characterizing Jefferson's Bill for Establishing Religious Freedom, the guaranty he put in our national charter, like the bill he piloted through the Virginia Assembly, was "a Model of technical precision, and perspicuous brevity." [8] Madison could not have confused "church" and "religion," or "an established church" and "an establishment of religion."

The Amendment's purpose was not to strike merely at the official establishment of a single sect, creed or religion, outlawing only a formal relation such as had prevailed in England and some of the colonies. Necessarily it was to uproot all such relationships. But the object was broader than separating church and state in this narrow sense. It was to create a complete and permanent separation of the

---

[8] IX Writings of James Madison (ed. by Hunt, 1910) 288; Padover, Jefferson (1942) 74. Madison's characterization related to Jefferson's entire revision of the Virginia Code, of which the Bill for Establishing Religious Freedom was part. See note 15.

spheres of religious activity and civil authority by comprehensively forbidding every form of public aid or support for religion. In proof the Amendment's wording and history unite with this Court's consistent utterances whenever attention has been fixed directly upon the question.

"Religion" appears only once in the Amendment. But the word governs two prohibitions and governs them alike. It does not have two meanings, one narrow to forbid "an establishment" and another, much broader, for securing "the free exercise thereof." "Thereof" brings down "religion" with its entire and exact content, no more and no less, from the first into the second guaranty, so that Congress and now the states are as broadly restricted concerning the one as they are regarding the other.

No one would claim today that the Amendment is constricted, in "prohibiting the free exercise" of religion, to securing the free exercise of some formal or creedal observance, of one sect or of many. It secures all forms of religious expression, creedal, sectarian or nonsectarian, wherever and however taking place, except conduct which trenches upon the like freedoms of others or clearly and presently endangers the community's good order and security.[9] For the protective purposes of this phase of the basic freedom, street preaching, oral or by distribution of

[9] See *Reynolds v. United States*, 98 U. S. 145; *Davis v. Beason*, 133 U. S. 333; *Mormon Church v. United States*, 136 U. S. 1; *Jacobson v. Massachusetts*, 197 U. S. 11; *Prince v. Massachusetts*, 321 U. S. 158; also *Cleveland v. United States*, 329 U. S. 14.

Possibly the first official declaration of the "clear and present danger" doctrine was Jefferson's declaration in the Virginia Statute for Establishing Religious Freedom: "That it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order." 1 Randall, The Life of Thomas Jefferson (1858) 220; Padover, Jefferson (1942) 81. For Madison's view to the same effect, see note 28 *infra*.

literature, has been given "the same high estate under the First Amendment as . . . worship in the churches and preaching from the pulpits." [10]   And on this basis parents have been held entitled to send their children to private, religious schools.  *Pierce* v. *Society of Sisters,* 268 U. S. 510. Accordingly, daily religious education commingled with secular is "religion" within the guaranty's comprehensive scope.   So are religious training and teaching in whatever form.   The word connotes the broadest content, determined not by the form or formality of the teaching or where it occurs, but by its essential nature regardless of those details.

"Religion" has the same broad significance in the twin prohibition concerning "an establishment."   The Amendment was not duplicitous.   "Religion" and "establishment" were not used in any formal or technical sense. The prohibition broadly forbids state support, financial or other, of religion in any guise, form or degree.   It outlaws all use of public funds for religious purposes.

## II.

No provision of the Constitution is more closely tied to or given content by its generating history than the religious clause of the First Amendment.   It is at once the refined product and the terse summation of that history. The history includes not only Madison's authorship and the proceedings before the First Congress, but also the long and intensive struggle for religious freedom in America, more especially in Virginia,[11] of which the Amend-

---

[10] *Murdock* v. *Pennsylvania,* 319 U. S. 105, 109; *Martin* v. *Struthers,* 319 U. S. 141; *Jamison* v. *Texas,* 318 U. S. 413; *Marsh* v. *Alabama,* 326 U. S. 501; *Tucker* v. *Texas,* 326 U. S. 517.

[11] Conflicts in other states, and earlier in the colonies, contributed much to generation of the Amendment, but none so directly as that in Virginia or with such formative influence on the Amendment's

ment was the direct culmination.[12]   In the documents of the times, particularly of Madison, who was leader in the Virginia struggle before he became the Amendment's sponsor, but also in the writings of Jefferson and others and in the issues which engendered them is to be found irrefutable confirmation of the Amendment's sweeping content.

For Madison, as also for Jefferson, religious freedom was the crux of the struggle for freedom in general.   Remonstrance, Par. 15, Appendix hereto.   Madison was coauthor with George Mason of the religious clause in Virginia's great Declaration of Rights of 1776.   He is credited with changing it from a mere statement of the principle of tolerance to the first official legislative pronouncement that freedom of conscience and religion are inherent rights of the individual.[13]   He sought also to have the Declara-

---

content and wording.   See Cobb, Rise of Religious Liberty in America (1902); Sweet, The Story of Religion in America (1939).   The Charter of Rhode Island of 1663, II Poore, Constitutions (1878) 1595, was the first colonial charter to provide for religious freedom.

The climactic period of the Virginia struggle covers the decade 1776–1786, from adoption of the Declaration of Rights to enactment of the Statute for Religious Freedom.   For short accounts see Padover, Jefferson (1942) c. V; Brant, James Madison, The Virginia Revolutionist (1941) cc. XII, XV; James, The Struggle for Religious Liberty in Virginia (1900) cc. X, XI; Eckenrode, Separation of Church and State in Virginia (1910).   These works and Randall, see note 1, will be cited in this opinion by the names of their authors.   Citations to "Jefferson" refer to The Works of Thomas Jefferson (ed. by Ford, 1904–1905); to "Madison," to The Writings of James Madison (ed. by Hunt, 1901–1910).

[12] Brant, cc. XII, XV; James, cc. X, XI; Eckenrode.

[13] See Brant, c. XII, particularly at 243.   Cf. Madison's Remonstrance, Appendix to this opinion.   Jefferson of course held the same view.   See note 15.

"Madison looked upon . . . religious freedom, to judge from the concentrated attention he gave it, as the fundamental freedom." Brant, 243; and see Remonstrance, Par. 1, 4, 15, Appendix.

tion expressly condemn the existing Virginia establish-
ment.[14] But the forces supporting it were then too
strong.

Accordingly Madison yielded on this phase but not for
long. At once he resumed the fight, continuing it before
succeeding legislative sessions. As a member of the Gen-
eral Assembly in 1779 he threw his full weight behind
Jefferson's historic Bill for Establishing Religious Free-
dom. That bill was a prime phase of Jefferson's broad
program of democratic reform undertaken on his return
from the Continental Congress in 1776 and submitted for
the General Assembly's consideration in 1779 as his pro-
posed revised Virginia code.[15] With Jefferson's departure
for Europe in 1784, Madison became the Bill's prime

[14] See Brant, 245–246. Madison quoted liberally from the Declara-
tion in his Remonstrance and the use made of the quotations indicates
that he considered the Declaration to have outlawed the prevailing
establishment in principle, if not technically.

[15] Jefferson was chairman of the revising committee and chief drafts-
man. Corevisers were Wythe, Pendleton, Mason and Lee. The first
enacted portion of the revision, which became known as Jefferson's
Code, was the statute barring entailments. Primogeniture soon fol-
lowed. Much longer the author was to wait for enactment of the Bill
for Religious Freedom; and not until after his death was the corollary
bill to be accepted in principle which he considered most important of
all, namely, to provide for common education at public expense. See
V Jefferson, 153. However, he linked this with disestablishment as
corollary prime parts in a system of basic freedoms. I Jefferson, 78.

Jefferson, and Madison by his sponsorship, sought to give the Bill
for Establishing Religious Freedom as nearly constitutional status as
they could at the time. Acknowledging that one legislature could not
"restrain the acts of succeeding Assemblies . . . and that therefore
to declare this act irrevocable would be of no effect in law," the
Bill's concluding provision as enacted nevertheless asserted: "Yet we
are free to declare, and do declare, that the rights hereby asserted are
of the natural rights of mankind, and that if any act shall be hereafter
passed to repeal the present or to narrow its operation, such act will
be an infringement of natural right." 1 Randall, 220.

sponsor.[16]   Enactment failed in successive legislatures
from its introduction in June, 1779, until its adoption in
January, 1786.   But during all this time the fight for re-
ligious freedom moved forward in Virginia on various
fronts with growing intensity.   Madison led throughout,
against Patrick Henry's powerful opposing leadership
until Henry was elected governor in November, 1784.

The climax came in the legislative struggle of 1784–1785
over the Assessment Bill.   See Supplemental Appendix
hereto.   This was nothing more nor less than a taxing
measure for the support of religion, designed to revive the
payment of tithes suspended since 1777.   So long as it
singled out a particular sect for preference it incurred the
active and general hostility of dissentient groups.   It was
broadened to include them, with the result that some sub-
sided temporarily in their opposition.[17]   As altered, the
bill gave to each taxpayer the privilege of designating
which church should receive his share of the tax.   In
default of designation the legislature applied it to pious
uses.[18]   But what is of the utmost significance here, "in

[16] See I Jefferson, 70–71; XII Jefferson, 447; Padover, 80.

[17] Madison regarded this action as desertion.   See his letter to
Monroe of April 12, 1785; II Madison, 129, 131–132; James, cc. X,
XI.   But see Eckenrode, 91, suggesting it was surrender to the
inevitable.

The bill provided: "That for every sum so paid, the Sheriff or Col-
lector shall give a receipt, expressing therein to what society of
Christians the person from whom he may receive the same shall direct
the money to be paid . . . ."   See also notes 19, 43 *infra*.

A copy of the Assessment Bill is to be found among the Washington
manuscripts in the Library of Congress.   Papers of George Washing-
ton, Vol. 231.   Because of its crucial role in the Virginia struggle and
bearing upon the First Amendment's meaning, the text of the Bill
is set forth in the Supplemental Appendix to this opinion.

[18] Eckenrode, 99, 100.

its final form the bill left the taxpayer the option of giving his tax to education." [19]

Madison was unyielding at all times, opposing with all his vigor the general and nondiscriminatory as he had the earlier particular and discriminatory assessments proposed. The modified Assessment Bill passed second reading in December, 1784, and was all but enacted. Madison and his followers, however, maneuvered deferment of final consideration until November, 1785. And before the Assembly reconvened in the fall he issued his historic Memorial and Remonstrance. [20]

This is Madison's complete, though not his only, interpretation of religious liberty. [21] It is a broadside attack upon all forms of "establishment" of religion, both general and particular, nondiscriminatory or selective. Reflecting not only the many legislative conflicts over the Assessment Bill and the Bill for Establishing Religious Freedom but also, for example, the struggles for religious incorporations and the continued maintenance of the glebes, the Remonstrance is at once the most concise and the most accurate statement of the views of the First Amendment's author concerning what is "an establishment of religion." Because it behooves us in the dimming distance of time not

---

[19] *Id.*, 100; II Madison, 113. The bill directed the sheriff to pay "all sums which . . . may not be appropriated by the person paying the same . . . into the public Treasury, to be disposed of under the direction of the General Assembly, for the encouragement of seminaries of learning within the Counties whence such sums shall arise, and to no other use or purpose whatsoever." Supplemental Appendix.

[20] See generally Eckenrode, c. V; Brant, James, and other authorities cited in note 11 above.

[21] II Madison, 183; and the Appendix to this opinion. Eckenrode, 100 ff. See also Fleet, Madison's "Detached Memoranda" (1946) III William & Mary Q. (3d Series) 534, 554–562.

to lose sight of what he and his coworkers had in mind when, by a single sweeping stroke of the pen, they forbade an establishment of religion and secured its free exercise, the text of the Remonstrance is appended at the end of this opinion for its wider current reference, together with a copy of the bill against which it was directed.

The Remonstrance, stirring up a storm of popular protest, killed the Assessment Bill.[22]   It collapsed in committee shortly before Christmas, 1785.   With this, the way was cleared at last for enactment of Jefferson's Bill for Establishing Religious Freedom.   Madison promptly drove it through in January of 1786, seven years from the time it was first introduced.   This dual victory substantially ended the fight over establishments, settling the issue against them.   See note 33.

The next year Madison became a member of the Constitutional Convention.   Its work done, he fought valiantly to secure the ratification of its great product in Virginia as elsewhere, and nowhere else more effectively.[23] Madison was certain in his own mind that under the Constitution "there is not a shadow of right in the general government to intermeddle with religion" [24] and that "this subject is, for the honor of America, perfectly free and

---

[22] The major causes assigned for its defeat include the elevation of Patrick Henry to the governorship in November of 1784; the blunder of the proponents in allowing the Bill for Incorporations to come to the floor and incur defeat before the Assessment Bill was acted on; Madison's astute leadership, taking advantage of every "break" to convert his initial minority into a majority, including the deferment of action on the third reading to the fall; the Remonstrance, bringing a flood of protesting petitions; and the general poverty of the time.   See Eckenrode, c. V, for an excellent short, detailed account.

[23] See James, Brant, *op. cit. supra* note 11.

[24] V Madison, 176.   Cf. notes 33, 37.

unshackled. The government has no jurisdiction over it . . . ." [25] Nevertheless he pledged that he would work for a Bill of Rights, including a specific guaranty of religious freedom, and Virginia, with other states, ratified the Constitution on this assurance.[26]

Ratification thus accomplished, Madison was sent to the first Congress. There he went at once about performing his pledge to establish freedom for the nation as he had done in Virginia. Within a little more than three years from his legislative victory at home he had proposed and secured the submission and ratification of the First Amendment as the first article of our Bill of Rights.[27]

All the great instruments of the Virginia struggle for religious liberty thus became warp and woof of our constitutional tradition, not simply by the course of history, but by the common unifying force of Madison's life, thought and sponsorship. He epitomized the whole of that tradition in the Amendment's compact, but nonetheless comprehensive, phrasing.

As the Remonstrance discloses throughout, Madison opposed every form and degree of official relation between religion and civil authority. For him religion was a wholly private matter beyond the scope of civil power

---

[25] V Madison, 132.

[26] Brant, 250. The assurance made first to his constituents was responsible for Madison's becoming a member of the Virginia Convention which ratified the Constitution. See James, 154–158.

[27] The amendment with respect to religious liberties read, as Madison introduced it: "The civil rights of none shall be abridged on account of religious belief or worship, nor shall any national religion be established, nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed." 1 Annals of Congress 434. In the process of debate this was modified to its present form. See especially 1 Annals of Congress 729–731, 765; also note 34.

either to restrain or to support.[28]    Denial or abridgment
of religious freedom was a violation of rights both of con-
science and of natural equality.    State aid was no less
obnoxious or destructive to freedom and to religion itself
than other forms of state interference.    "Establishment"
and "free exercise" were correlative and coextensive ideas,
representing only different facets of the single great and
fundamental freedom.    The Remonstrance, following the
Virginia statute's example, referred to the history of
religious conflicts and the effects of all sorts of establish-
ments, current and historical, to suppress religion's free
exercise.    With Jefferson, Madison believed that to toler-
ate any fragment of establishment would be by so much to
perpetuate restraint upon that freedom.    Hence he
sought to tear out the institution not partially but root
and branch, and to bar its return forever.

In no phase was he more unrelentingly absolute than in
opposing state support or aid by taxation.    Not even
"three pence" contribution was thus to be exacted from
any citizen for such a purpose.    Remonstrance, Par. 3.[29]

[28] See text of the Remonstrance, Appendix; also notes 13, 15, 24, 25
*supra* and text.

Madison's one exception concerning restraint was for "preserving
public order."    Thus he declared in a private letter, IX Madison, 484,
487, written after the First Amendment was adopted: "The tendency
to a usurpation on one side or the other, or to a corrupting coalition or
alliance between them, will be best guarded agst. by an entire absti-
nance of the Govt. from interference in any way whatever, beyond the
necessity of preserving public order, & protecting each sect agst.
trespasses on its legal rights by others."    Cf. note 9.

[29] The third ground of remonstrance, see the Appendix, bears repe-
tition for emphasis here: "Because, it is proper to take alarm at the
first experiment on our liberties . . .    The freemen of America did
not wait till usurped power had strengthened itself by exercise, and
entangled the question in precedents.    They saw all the consequences
in the principle, and they avoided the consequences by denying the
principle.    We revere this lesson too much, soon to forget it.    Who

Tithes had been the lifeblood of establishment before and after other compulsions disappeared. Madison and his coworkers made no exceptions or abridgments to the complete separation they created. Their objection was not to small tithes. It was to any tithes whatsoever. "If it were lawful to impose a small tax for religion, the admission would pave the way for oppressive levies." [30] Not the amount but "the principle of assessment was wrong." And the principle was as much to prevent "the interference of law in religion" as to restrain religious intervention in political matters.[31] In this field the authors of our freedom would not tolerate "the first experiment on our liberties" or "wait till usurped power had strengthened itself by exercise, and entangled the question in precedents." Remonstrance, Par. 3. Nor should we.

In view of this history no further proof is needed that the Amendment forbids any appropriation, large or small, from public funds to aid or support any and all religious exercises. But if more were called for, the debates in the First Congress and this Court's consistent expressions, whenever it has touched on the matter directly,[32] supply it.

---

does not see that . . . the same authority which can force a citizen to *contribute three pence* only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?" (Emphasis added.) II Madison 183, 185–186.

[30] Eckenrode, 105, in summary of the Remonstrance.

[31] "Because the bill implies either that the Civil Magistrate is a competent Judge of Religious truth; or that he may employ Religion as an engine of Civil policy. The first is an arrogant pretention falsified by the contradictory opinions of Rulers in all ages, and throughout the world: The second an unhallowed perversion of the means of salvation." Remonstrance, Appendix, Par. 5; II Madison 183, 187.

[32] As is pointed out above, note 3, and in Part IV *infra, Cochran* v. *Board of Education,* 281 U. S. 370, was not such a case.

By contrast with the Virginia history, the congressional debates on consideration of the Amendment reveal only sparse discussion, reflecting the fact that the essential issues had been settled.[33] Indeed the matter had become so well understood as to have been taken for granted in all but formal phrasing. Hence, the only enlightening reference shows concern, not to preserve any power to use public funds in aid of religion, but to prevent the Amendment from outlawing private gifts inadvertently by virtue of the breadth of its wording.[34] In the

---

[33] See text *supra* at notes 24, 25. Madison, of course, was but one of many holding such views, but nevertheless agreeing to the common understanding for adoption of a Bill of Rights in order to remove all doubt engendered by the absence of explicit guaranties in the original Constitution.

By 1791 the great fight over establishments had ended, although some vestiges remained then and later, even in Virginia. The glebes, for example, were not sold there until 1802. Cf. Eckenrode, 147. Fixing an exact date for "disestablishment" is almost impossible, since the process was piecemeal. Although Madison failed in having the Virginia Bill of Rights declare explicitly against establishment in 1776, cf. note 14 and text *supra*, in 1777 the levy for support of the Anglican clergy was suspended. It was never resumed. Eckenrode states: "This act, in effect, destroyed the establishment. Many dates have been given for its end, but it really came on January 1, 1777, when the act suspending the payment of tithes became effective. This was not seen at the time. . . . But in freeing almost half of the taxpayers from the burden of the state religion, the state religion was at an end. Nobody could be forced to support it, and an attempt to levy tithes upon Anglicans alone would be to recruit the ranks of dissent." P. 53. See also pp. 61, 64. The question of assessment however was revived "with far more strength than ever, in the summer of 1784." *Id.*, 64. It would seem more factual therefore to fix the time of disestablishment as of December, 1785–January, 1786, when the issue in large was finally settled.

[34] At one point the wording was proposed: "No religion shall be established by law, nor shall the equal rights of conscience be infringed." 1 Annals of Congress 729. Cf. note 27. Representative Huntington of Connecticut feared this might be construed to prevent

margin are noted also the principal decisions in which expressions of this Court confirm the Amendment's broad prohibition.[35]

judicial enforcement of private pledges. He stated "that he feared . . . that the words might be taken in such latitude as to be extremely hurtful to the cause of religion. He understood the amendment to mean what had been expressed by the gentleman from Virginia; but others might find it convenient to put another construction upon it. The ministers of their congregations to the Eastward were maintained by the contributions of those who belonged to their society; the expense of building meeting-houses was contributed in the same manner. These things were regulated by by-laws. If an action was brought before a Federal Court on any of these cases, the person who had neglected to perform his engagements could not be compelled to do it; for a support of ministers or building of places of worship might be construed into a religious establishment." 1 Annals of Congress 730.

To avoid any such possibility, Madison suggested inserting the word "national" before "religion," thereby not only again disclaiming intent to bring about the result Huntington feared but also showing unmistakably that "establishment" meant public "support" of religion in the financial sense. 1 Annals of Congress 731. See also IX Madison, 484–487.

[35] The decision most closely touching the question, where it was squarely raised, is *Quick Bear* v. *Leupp*, 210 U. S. 50. The Court distinguished sharply between appropriations from public funds for the support of religious education and appropriations from funds held in trust by the Government essentially as trustee for private individuals, Indian wards, as beneficial owners. The ruling was that the latter could be disbursed to private, religious schools at the designation of those patrons for paying the cost of their education. But it was stated also that such a use of public moneys would violate both the First Amendment and the specific statutory declaration involved, namely, that "it is hereby declared to be the settled policy of the Government to hereafter make no appropriation whatever for education in any sectarian school." 210 U. S. at 79. Cf. *Ponce* v. *Roman Catholic Apostolic Church,* 210 U. S. 296, 322. And see *Bradfield* v. *Roberts,* 175 U. S. 291, an instance of highly artificial grounding to support a decision sustaining an appropriation for the care of indigent patients pursuant to a contract with a private hospital. Cf. also the authorities cited in note 9.

## III.

Compulsory attendance upon religious exercises went out early in the process of separating church and state, together with forced observance of religious forms and ceremonies.[36]  Test oaths and religious qualification for office followed later.[37]  These things none devoted to our great tradition of religious liberty would think of bringing back.  Hence today, apart from efforts to inject religious training or exercises and sectarian issues into the public schools, the only serious surviving threat to maintaining that complete and permanent separation of religion and civil power which the First Amendment commands is through use of the taxing power to support religion, religious establishments, or establishments having a religious foundation whatever their form or special religious function.

Does New Jersey's action furnish support for religion by use of the taxing power?  Certainly it does, if the test remains undiluted as Jefferson and Madison made it, that money taken by taxation from one is not to be used or given to support another's religious training or belief, or indeed one's own.[38]  Today as then the furnishing of "con-

---

[36] See text at note 1.

[37] ". . . but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States."  Const., Art. VI, § 3.  See also the two forms prescribed for the President's Oath or Affirmation.  Const., Art. II, § 1.  Cf. *Ex parte Garland*, 4 Wall. 333; *Cummings* v. *Missouri*, 4 Wall. 277; *United States* v. *Lovett*, 328 U. S. 303.

[38] In the words of the Virginia statute, following the portion of the preamble quoted at the beginning of this opinion: ". . . even the forcing him to support this or that teacher of his own religious persuasion, is depriving him of the comfortable liberty of giving his contributions to the particular pastor, whose morals he would make his pattern, and whose powers he feels most persuasive to righteousness, and is withdrawing from the ministry those temporary rewards, which pro-

tributions of money for the propagation of opinions which he disbelieves" is the forbidden exaction; and the prohibition is absolute for whatever measure brings that consequence and whatever amount may be sought or given to that end.

The funds used here were raised by taxation. The Court does not dispute, nor could it, that their use does in fact give aid and encouragement to religious instruction. It only concludes that this aid is not "support" in law. But Madison and Jefferson were concerned with aid and support in fact, not as a legal conclusion "entangled in precedents." Remonstrance, Par. 3. Here parents pay money to send their children to parochial schools and funds raised by taxation are used to reimburse them. This not only helps the children to get to school and the parents to send them. It aids them in a substantial way to get the very thing which they are sent to the particular school to secure, namely, religious training and teaching.

Believers of all faiths, and others who do not express their feeling toward ultimate issues of existence in any creedal form, pay the New Jersey tax. When the money so raised is used to pay for transportation to religious schools, the Catholic taxpayer to the extent of his proportionate share pays for the transportation of Lutheran, Jewish and otherwise religiously affiliated children to receive their non-Catholic religious instruction. Their parents likewise pay proportionately for the transportation of Catholic children to receive Catholic instruction. Each thus contributes to "the propagation of opinions which he disbelieves" in so far as their religions differ, as do others who accept no creed without regard to those differences. Each

---

ceeding from an approbation of their personal conduct, are an additional incitement to earnest and unremitting labours for the instruction of mankind . . . ." Cf. notes 29, 30, 31 and text *supra.*

thus pays taxes also to support the teaching of his own religion, an exaction equally forbidden since it denies "the comfortable liberty" of giving one's contribution to the particular agency of instruction he approves.[39]

New Jersey's action therefore exactly fits the type of exaction and the kind of evil at which Madison and Jefferson struck. Under the test they framed it cannot be said that the cost of transportation is no part of the cost of education or of the religious instruction given. That it is a substantial and a necessary element is shown most plainly by the continuing and increasing demand for the state to assume it. Nor is there pretense that it relates only to the secular instruction given in religious schools or that any attempt is or could be made toward allocating proportional shares as between the secular and the religious instruction. It is precisely because the instruction is religious and relates to a particular faith, whether one or another, that parents send their children to religious schools under the *Pierce* doctrine. And the very purpose of the state's contribution is to defray the cost of conveying the pupil to the place where he will receive not simply secular, but also and primarily religious, teaching and guidance.

Indeed the view is sincerely avowed by many of various faiths,[40] that the basic purpose of all education is or should be religious, that the secular cannot be and should not be separated from the religious phase and emphasis. Hence,

---

[39] See note 38.

[40] See Bower, Church and State in Education (1944) 58: ". . . the fundamental division of the education of the whole self into the secular and the religious could not be justified on the grounds of either a sound educational philosophy or a modern functional concept of the relation of religion to personal and social experience." See also Vere, The Elementary School, in Essays on Catholic Education in the United States (1942) 110–111; Gabel, Public Funds for Church and Private Schools (1937) 737–739.

the inadequacy of public or secular education and the necessity for sending the child to a school where religion is taught. But whatever may be the philosophy or its justification, there is undeniably an admixture of religious with secular teaching in all such institutions. That is the very reason for their being. Certainly for purposes of constitutionality we cannot contradict the whole basis of the ethical and educational convictions of people who believe in religious schooling.

Yet this very admixture is what was disestablished when the First Amendment forbade "an establishment of religion." Commingling the religious with the secular teaching does not divest the whole of its religious permeation and emphasis or make them of minor part, if proportion were material. Indeed, on any other view, the constitutional prohibition always could be brought to naught by adding a modicum of the secular.

An appropriation from the public treasury to pay the cost of transportation to Sunday school, to weekday special classes at the church or parish house, or to the meetings of various young people's religious societies, such as the Y. M. C. A., the Y. W. C. A., the Y. M. H. A., the Epworth League, could not withstand the constitutional attack. This would be true, whether or not secular activities were mixed with the religious. If such an appropriation could not stand, then it is hard to see how one becomes valid for the same thing upon the more extended scale of daily instruction. Surely constitutionality does not turn on where or how often the mixed teaching occurs.

Finally, transportation, where it is needed, is as essential to education as any other element. Its cost is as much a part of the total expense, except at times in amount, as the cost of textbooks, of school lunches, of athletic equipment, of writing and other materials; indeed of all other

48

items composing the total burden. Now as always the core of the educational process is the teacher-pupil relationship. Without this the richest equipment and facilities would go for naught. See *Judd* v. *Board of Education,* 278 N. Y. 200, 212, 15 N. E. 2d 576, 582. But the proverbial Mark Hopkins conception no longer suffices for the country's requirements. Without buildings, without equipment, without library, textbooks and other materials, and without transportation to bring teacher and pupil together in such an effective teaching environment, there can be not even the skeleton of what our times require. Hardly can it be maintained that transportation is the least essential of these items, or that it does not in fact aid, encourage, sustain and support, just as they do, the very process which is its purpose to accomplish. No less essential is it, or the payment of its cost, than the very teaching in the classroom or payment of the teacher's sustenance. Many types of equipment, now considered essential, better could be done without.

For me, therefore, the feat is impossible to select so indispensable an item from the composite of total costs, and characterize it as not aiding, contributing to, promoting or sustaining the propagation of beliefs which it is the very end of all to bring about. Unless this can be maintained, and the Court does not maintain it, the aid thus given is outlawed. Payment of transportation is no more, nor is it any the less essential to education, whether religious or secular, than payment for tuitions, for teachers' salaries, for buildings, equipment and necessary materials. Nor is it any the less directly related, in a school giving religious instruction, to the primary religious objective all those essential items of cost are intended to achieve. No rational line can be drawn between payment for such larger, but not more necessary, items and payment for transportation. The only line that can be so drawn is one between more dollars and less. Certainly in this

realm such a line can be no valid constitutional measure. *Murdock* v. *Pennsylvania,* 319 U. S. 105; *Thomas* v. *Collins,* 323 U. S. 516.[41]  Now, as in Madison's time, not the amount but the principle of assessment is wrong.  Remonstrance, Par. 3.

## IV.

But we are told that the New Jersey statute is valid in its present application because the appropriation is for a public, not a private purpose, namely, the promotion of education, and the majority accept this idea in the conclusion that all we have here is "public welfare legislation." If that is true and the Amendment's force can be thus destroyed, what has been said becomes all the more pertinent. For then there could be no possible objection to more extensive support of religious education by New Jersey.

If the fact alone be determinative that religious schools are engaged in education, thus promoting the general and individual welfare, together with the legislature's decision that the payment of public moneys for their aid makes their work a public function, then I can see no possible basis, except one of dubious legislative policy, for the state's refusal to make full appropriation for support of private, religious schools, just as is done for public

---

[41] It would seem a strange ruling that a "reasonable," that is, presumably a small, license fee cannot be placed upon the exercise of the right of religious instruction, yet that under the correlative constitutional guaranty against "an establishment" taxes may be levied and used to aid and promote religious instruction, if only the amounts so used are small.  See notes 30–31 *supra* and text.

Madison's objection to "three pence" contributions and his stress upon "denying the principle" without waiting until "usurped power had . . . entangled the question in precedents," note 29, were reinforced by his further characterization of the Assessment Bill: "Distant as it may be, in its present form, from the Inquisition it differs from it only in degree.  The one is the first step, the other the last in the career of intolerance."  Remonstrance, Par. 9; II Madison 183, 188.

instruction. There could not be, on that basis, valid constitutional objection.[42]

Of course paying the cost of transportation promotes the general cause of education and the welfare of the individual. So does paying all other items of educational expense. And obviously, as the majority say, it is much too late to urge that legislation designed to facilitate the opportunities of children to secure a secular education serves no public purpose. Our nation-wide system of public education rests on the contrary view, as do all grants in aid of education, public or private, which is not religious in character.

These things are beside the real question. They have no possible materiality except to obscure the all-pervading, inescapable issue. *Cf. Cochran* v. *Board of Education, supra.* Stripped of its religious phase, the case presents no substantial federal question. *Ibid.* The public function argument, by casting the issue in terms of promoting the general cause of education and the welfare of the individual, ignores the religious factor and its essential connection with the transportation, thereby leaving out the only vital element in the case. So of course do the "public welfare" and "social legislation" ideas, for they come to the same thing.

---

[42] If it is part of the state's function to supply to religious schools or their patrons the smaller items of educational expense, because the legislature may say they perform a public function, it is hard to see why the larger ones also may not be paid. Indeed, it would seem even more proper and necessary for the state to do this. For if one class of expenditures is justified on the ground that it supports the general cause of education or benefits the individual, or can be made to do so by legislative declaration, so even more certainly would be the other. To sustain payment for transportation to school, for textbooks, for other essential materials, or perhaps for school lunches, and not for what makes all these things effective for their intended end, would be to make a public function of the smaller items and their cumulative effect, but to make wholly private in character the larger things without which the smaller could have no meaning or use.

We have here then one substantial issue, not two. To say that New Jersey's appropriation and her use of the power of taxation for raising the funds appropriated are not for public purposes but are for private ends, is to say that they are for the support of religion and religious teaching. Conversely, to say that they are for public purposes is to say that they are not for religious ones.

This is precisely for the reason that education which includes religious training and teaching, and its support, have been made matters of private right and function, not public, by the very terms of the First Amendment. That is the effect not only in its guaranty of religion's free exercise, but also in the prohibition of establishments. It was on this basis of the private character of the function of religious education that this Court held parents entitled to send their children to private, religious schools. *Pierce* v. *Society of Sisters, supra.* Now it declares in effect that the appropriation of public funds to defray part of the cost of attending those schools is for a public purpose. If so, I do not understand why the state cannot go farther or why this case approaches the verge of its power.

In truth this view contradicts the whole purpose and effect of the First Amendment as heretofore conceived. The "public function"—"public welfare"—"social legislation" argument seeks, in Madison's words, to "employ Religion [that is, here, religious education] as an engine of Civil policy." Remonstrance, Par. 5. It is of one piece with the Assessment Bill's preamble, although with the vital difference that it wholly ignores what that preamble explicitly states.[43]

---

[43] "Whereas the general diffusion of Christian knowledge hath a natural tendency to correct the morals of men, restrain their vices, and preserve the peace of society; which cannot be effected without a competent provision for learned teachers, who may be thereby enabled to devote their time and attention to the duty of instructing such citizens, as from their circumstances and want of education, cannot otherwise attain such knowledge; and it is judged that such pro-

Our constitutional policy is exactly the opposite. It does not deny the value or the necessity for religious training, teaching or observance. Rather it secures their free exercise. But to that end it does deny that the state can undertake or sustain them in any form or degree. For this reason the sphere of religious activity, as distinguished from the secular intellectual liberties, has been given the twofold protection and, as the state cannot forbid, neither can it perform or aid in performing the religious function. The dual prohibition makes that function altogether private. It cannot be made a public one by legislative act. This was the very heart of Madison's Remonstrance, as it is of the Amendment itself.

It is not because religious teaching does not promote the public or the individual's welfare, but because neither is furthered when the state promotes religious education, that the Constitution forbids it to do so. Both legislatures and courts are bound by that distinction. In failure to observe it lies the fallacy of the "public function"—"social legislation" argument, a fallacy facilitated by easy transference of the argument's basing from due process unrelated to any religious aspect to the First Amendment.

By no declaration that a gift of public money to religious uses will promote the general or individual welfare, or the cause of education generally, can legislative bodies overcome the Amendment's bar. Nor may the courts sustain their attempts to do so by finding such consequences for appropriations which in fact give aid to or promote religious uses. Cf. *Norris* v. *Alabama,* 294 U. S. 587, 590; *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652, 659; *Akins* v. *Texas,* 325 U. S. 398, 402. Legislatures are free to make,

vision may be made by the Legislature, without counteracting the liberal principle heretofore adopted and intended to be preserved by abolishing all distinctions of pre-eminence amongst the different societies of communities of Christians; . . . ." Supplemental Appendix; Foote, Sketches of Virginia (1850) 340.

and courts to sustain, appropriations only when it can be found that in fact they do not aid, promote, encourage or sustain religious teaching or observances, be the amount large or small. No such finding has been or could be made in this case. The Amendment has removed this form of promoting the public welfare from legislative and judicial competence to make a public function. It is exclusively a private affair.

The reasons underlying the Amendment's policy have not vanished with time or diminished in force. Now as when it was adopted the price of religious freedom is double. It is that the church and religion shall live both within and upon that freedom. There cannot be freedom of religion, safeguarded by the state, and intervention by the church or its agencies in the state's domain or dependency on its largesse. Madison's Remonstrance, Par. 6, 8.[44] The great condition of religious liberty is that it be maintained free from sustenance, as also from other interferences, by the state. For when it comes to rest upon that secular foundation it vanishes with the resting. *Id.,* Par. 7, 8.[45] Public money devoted to payment of religious costs, educational or other, brings the quest for more. It brings too the struggle of sect against sect for the larger share or for any. Here one by numbers alone will benefit most, there another. That is precisely the history of societies which have had an established religion and dissident

---

[44] "Because the establishment proposed by the Bill is not requisite for the support of the Christian Religion. To say that it is, is a contradiction to the Christian Religion itself; for every page of it disavows a dependence on the powers of this world . . . . Because the establishment in question is not necessary for the support of Civil Government. . . . What influence in fact have ecclesiastical establishments had on Civil Society? . . . in no instance have they been seen the guardians of the liberties of the people." II Madison 183, 187, 188.

[45] "Because experience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." II Madison 183, 187.

groups. *Id.,* Par. 8, 11. It is the very thing Jefferson and Madison experienced and sought to guard against, whether in its blunt or in its more screened forms. *Ibid.* The end of such strife cannot be other than to destroy the cherished liberty. The dominating group will achieve the dominant benefit; or all will embroil the state in their dissensions. *Id.,* Par. 11.[46]

Exactly such conflicts have centered of late around providing transportation to religious schools from public funds.[47] The issue and the dissension work typically, in Madison's phrase, to "destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced amongst its several sects." *Id.,* Par. 11. This occurs, as he well knew, over measures

---

[46] "At least let warning be taken at the first fruits of the threatened innovation. The very appearance of the Bill has transformed that 'Christian forbearance, love and charity,' which of late mutually prevailed, into animosities and jealousies, which may not soon be appeased." II Madison 183, 189.

[47] In this case briefs *amici curiae* have been filed on behalf of various organizations representing three religious sects, one labor union, the American Civil Liberties Union, and the states of Illinois, Indiana, Louisiana, Massachusetts, Michigan and New York. All these states have laws similar to New Jersey's and all of them, with one religious sect, support the constitutionality of New Jersey's action. The others oppose it. Maryland and Mississippi have sustained similar legislation. Note 49 *infra.* No state without legislation of this sort has filed an opposing brief. But at least six states have held such action invalid, namely, Delaware, Oklahoma, New York, South Dakota, Washington and Wisconsin. Note 49 *infra.* The New York ruling was overturned by amendment to the state constitution in 1938. Constitution of New York, Art. XI, 4.

Furthermore, in this case the New Jersey courts divided, the Supreme Court holding the statute and resolution invalid, 132 N. J. L. 98, 39 A. 2d 75, the Court of Errors and Appeals reversing that decision, 133 N. J. L. 350, 44 A. 2d 333. In both courts, as here, the judges split, one of three dissenting in the Supreme Court, three of nine in the Court of Errors and Appeals. The division is typical. See the cases cited in note 49.

.

at the very threshold of departure from the principle. *Id.*, Par. 3, 9, 11.

In these conflicts wherever success has been obtained it has been upon the contention that by providing the transportation the general cause of education, the general welfare, and the welfare of the individual will be forwarded; hence that the matter lies within the realm of public function, for legislative determination.[48] State courts have divided upon the issue, some taking the view that only the individual, others that the institution receives the benefit.[49] A few have recognized that this dichotomy is false, that both in fact are aided.[50]

---

[48] See the authorities cited in note 49; and see note 54.

[49] Some state courts have sustained statutes granting free transportation or free school books to children attending denominational schools on the theory that the aid was a benefit to the child rather than to the school. See *Nichols* v. *Henry,* 301 Ky. 434, 191 S. W. 2d 930, with which compare *Sherrard* v. *Jefferson County Board of Education,* 294 Ky. 469, 171 S. W. 2d 963; *Cochran* v. *Board of Education,* 168 La. 1030, 123 So. 664, aff'd, 281 U. S. 370; *Borden* v. *Board of Education,* 168 La. 1005, 123 So. 655; *Board of Education* v. *Wheat,* 174 Md. 314, 199 A. 628; *Adams* v. *St. Mary's County,* 180 Md. 550, 26 A. 2d 377; *Chance* v. *State Textbook R. & P. Board,* 190 Miss. 453, 200 So. 706. See also *Bowker* v. *Baker,* 73 Cal. App. 2d 653, 167 P. 2d 256. Other courts have held such statutes unconstitutional under state constitutions as aid to the schools. *Judd* v. *Board of Education,* 278 N. Y. 200, 15 N. E. 2d 576, but see note 47 *supra; Smith* v. *Donahue,* 202 App. Div. 656, 195 N. Y. S. 715; *State ex rel. Traub* v. *Brown,* 36 Del. 181, 172 A. 835; *Gurney* v. *Ferguson,* 190 Okla. 254, 122 P. 2d 1002; *Mitchell* v. *Consolidated School District,* 17 Wash. 2d 61, 135 P. 2d 79; *Van Straten* v. *Milquet,* 180 Wis. 109, 192 N. W. 392. And cf. *Hlebanja* v. *Brewe,* 58 S. D. 351, 236 N. W. 296. And since many state constitutions have provisions forbidding the appropriation of public funds for private purposes, in these and other cases the issue whether the statute was for a "public" or "private" purpose has been present. See Note (1941) 50 Yale L. J. 917, 925.

[50] *E. g., Gurney* v. *Ferguson,* 190 Okla. 254, 255, 122 P. 2d 1002, 1003; *Mitchell* v. *Consolidated School District,* 17 Wash. 2d 61, 68,

The majority here does not accept in terms any of those views. But neither does it deny that the individual or the school, or indeed both, are benefited directly and substantially.[51] To do so would cut the ground from under the public function—social legislation thesis. On the contrary, the opinion concedes that the children are aided by being helped to get to the religious schooling. By converse necessary implication as well as by the absence of express denial, it must be taken to concede also that the school is helped to reach the child with its religious teaching. The religious enterprise is common to both, as is the interest in having transportation for its religious purposes provided.

Notwithstanding the recognition that this two-way aid is given and the absence of any denial that religious teaching is thus furthered, the Court concludes that the aid so given is not "support" of religion. It is rather only support of education as such, without reference to its religious content, and thus becomes public welfare legislation. To this elision of the religious element from the case is added gloss in two respects, one that the aid extended partakes of the nature of a safety measure, the other that failure to provide it would make the state unneutral in religious matters, discriminating against or hampering such children concerning public benefits all others receive.

---

135 P. 2d 79, 82; *Smith* v. *Donahue,* 202 App. Div. 656, 664, 195 N. Y. S. 715, 722; *Board of Education* v. *Wheat,* 174 Md. 314, dissenting opinion at 340, 199 A. 628 at 639. This is true whether the appropriation and payment are in form to the individual or to the institution. *Ibid.* Questions of this gravity turn upon the purpose and effect of the state's expenditure to accomplish the forbidden object, not upon who receives the amount and applies it to that end or the form and manner of the payment.

[51] The payments here averaged roughly $40.00 a year per child.

As will be noted, the one gloss is contradicted by the facts of record and the other is of whole cloth with the "public function" argument's excision of the religious factor.[52]   But most important is that this approach, if valid, supplies a ready method for nullifying the Amendment's guaranty, not only for this case and others involving small grants in aid for religious education, but equally for larger ones.   The only thing needed will be for the Court again to transplant the "public welfare—public function" view from its proper nonreligious due process bearing to First Amendment application, holding that religious education is not "supported" though it may be aided by the appropriation, and that the cause of education generally is furthered by helping the pupil to secure that type of training.

This is not therefore just a little case over bus fares. In paraphrase of Madison, distant as it may be in its present form from a complete establishment of religion, it differs from it only in degree; and is the first step in that direction.   *Id.*, Par. 9.[53]   Today as in his time "the same authority which can force a citizen to contribute three pence only . . . for the support of any one [religious] establishment, may force him" to pay more; or "to conform to any other establishment in all cases whatsoever."   And now, as then, "either . . . we must say, that the will of the Legislature is the only measure of their authority; and that in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred." Remonstrance, Par. 15.

The realm of religious training and belief remains, as the Amendment made it, the kingdom of the individual

[52] See Part V.

[53] See also note 46 *supra* and Remonstrance, Par. 3.

man and his God. It should be kept inviolately private, not "entangled . . . in precedents" [54] or confounded with what legislatures legitimately may take over into the public domain.

## V.

No one conscious of religious values can be unsympathetic toward the burden which our constitutional separation puts on parents who desire religious instruction mixed with secular for their children. They pay taxes for others' children's education, at the same time the added cost of instruction for their own. Nor can one happily see benefits denied to children which others receive, because in conscience they or their parents for them desire a different kind of training others do not demand.

But if those feelings should prevail, there would be an end to our historic constitutional policy and command. No more unjust or discriminatory in fact is it to deny attendants at religious schools the cost of their transportation than it is to deny them tuitions, sustenance for their teachers, or any other educational expense which others receive at public cost. Hardship in fact there is which none can blink. But, for assuring to those who undergo it the greater, the most comprehensive freedom, it is one written by design and firm intent into our basic law.

Of course discrimination in the legal sense does not exist. The child attending the religious school has the same right as any other to attend the public school. But he foregoes exercising it because the same guaranty which assures this freedom forbids the public school or any agency of the

---

[54] Thus each brief filed here by the supporters of New Jersey's action, see note 47, not only relies strongly on *Cochran* v. *Board of Education,* 281 U. S. 370, but either explicitly or in effect maintains that it is controlling in the present case.

.

state to give or aid him in securing the religious instruction he seeks.

Were he to accept the common school, he would be the first to protest the teaching there of any creed or faith not his own. And it is precisely for the reason that their atmosphere is wholly secular that children are not sent to public schools under the *Pierce* doctrine. But that is a constitutional necessity, because we have staked the very existence of our country on the faith that complete separation between the state and religion is best for the state and best for religion. Remonstrance, Par. 8, 12.

That policy necessarily entails hardship upon persons who forego the right to educational advantages the state can supply in order to secure others it is precluded from giving. Indeed this may hamper the parent and the child forced by conscience to that choice. But it does not make the state unneutral to withhold what the Constitution forbids it to give. On the contrary it is only by observing the prohibition rigidly that the state can maintain its neutrality and avoid partisanship in the dissensions inevitable when sect opposes sect over demands for public moneys to further religious education, teaching or training in any form or degree, directly or indirectly. Like St. Paul's freedom, religious liberty with a great price must be bought. And for those who exercise it most fully, by insisting upon religious education for their children mixed with secular, by the terms of our Constitution the price is greater than for others.

The problem then cannot be cast in terms of legal discrimination or its absence. This would be true, even though the state in giving aid should treat all religious instruction alike. Thus, if the present statute and its application were shown to apply equally to all religious schools

of whatever faith,[55] yet in the light of our tradition it could not stand. For then the adherent of one creed still would pay for the support of another, the childless taxpayer with others more fortunate. Then too there would seem to be no bar to making appropriations for transportation and other expenses of children attending public or other secular schools, after hours in separate places and classes for their exclusively religious instruction. The person who embraces no creed also would be forced to pay for teaching what he does not believe. Again, it was the furnishing of "contributions of money for the propagation of opinions which he disbelieves" that the fathers outlawed. That consequence and effect are not removed by multiplying to all-inclusiveness the sects for which support is exacted. The Constitution requires, not comprehensive identification of state with religion, but complete separation.

## VI.

Short treatment will dispose of what remains. Whatever might be said of some other application of New Jersey's statute, the one made here has no semblance of bearing as a safety measure or, indeed, for securing expeditious conveyance. The transportation supplied is by public conveyance, subject to all the hazards and delays of the highway and the streets incurred by the public generally in going about its multifarious business.

Nor is the case comparable to one of furnishing fire or police protection, or access to public highways. These things are matters of common right, part of the general

---

[55] See text at notes 17–19 *supra* and authorities cited; also Foote, Sketches of Virginia (1850) c. XV. Madison's entire thesis, as reflected throughout the Remonstrance and in his other writings, as well as in his opposition to the final form of the Assessment Bill, see note 43, was altogether incompatible with acceptance of general and "nondiscriminatory" support. See Brant, c. XII.

need for safety.[56]   Certainly the fire department must not stand idly by while the church burns.   Nor is this reason why the state should pay the expense of transportation or other items of the cost of religious education.[57]

Needless to add, we have no such case as *Green* v. *Frazier*, 253 U. S. 233, or *Carmichael* v. *Southern Coal Co.*, 301 U. S. 495, which dealt with matters wholly unrelated to the First Amendment, involving only situations where the "public function" issue was determinative.

I have chosen to place my dissent upon the broad ground I think decisive, though strictly speaking the case might be decided on narrower issues.   The New Jersey statute might be held invalid on its face for the exclusion of chil-

---

[56] The protections are of a nature which does not require appropriations specially made from the public treasury and earmarked, as is New Jersey's here, particularly for religious institutions or uses. The First Amendment does not exclude religious property or activities from protection against disorder or the ordinary accidental incidents of community life.   It forbids support, not protection from interference or destruction.

It is a matter not frequently recalled that President Grant opposed tax exemption of religious property as leading to a violation of the principle of separation of church and state.   See President Grant's Seventh Annual Message to Congress, December 7, 1875, in IX Messages and Papers of the Presidents (1897) 4288–4289.   Garfield, in a letter accepting the nomination for the presidency said: ". . . it would be unjust to our people, and dangerous to our institutions, to apply any portion of the revenues of the nation, or of the States, to the support of sectarian schools.   The separation of the Church and the State in everything relating to taxation should be absolute."   II The Works of James Abram Garfield (ed. by Hinsdale, 1883) 783.

[57] Neither do we have here a case of rate-making by which a public utility extends reduced fares to all school children, including patrons of religious schools.   Whether or not legislative compulsion upon a private utility to extend such an advantage would be valid, or its extension by a *municipally owned system, we are not required to consider*.   In the former instance, at any rate, and generally if not always in the latter, the vice of using the taxing power to raise funds for the support of religion would not be present.

dren who attend private, profit-making schools.[58]  I cannot assume, as does the majority, that the New Jersey courts would write off this explicit limitation from the statute.  Moreover, the resolution by which the statute was applied expressly limits its benefits to students of public and Catholic schools.[59]  There is no showing that there are no other private or religious schools in this populous district.[60]  I do not think it can be assumed there were none.[61]  But in the view I have taken, it is unnecessary to limit grounding to these matters.

[58] It would seem at least a doubtfully sufficient basis for reasonable classification that some children should be excluded simply because the only school feasible for them to attend, in view of geographic or other situation, might be one conducted in whole *or in part* for profit. Cf. note 5.

[59] See note 7 *supra*.  The resolution was as follows, according to the school board's minutes read in proof: "The transportation committee recommended the transportation of pupils of Ewing to the Trenton and Pennington High Schools *and Catholic Schools* by way of public carrier as in recent years.  On Motion of Mr. Ralph Ryan and Mr. M. French the same was adopted." (Emphasis added.)  The New Jersey court's holding that the resolution was within the authority conferred by the state statute is binding on us.  *Reinman* v. *Little Rock,* 237 U. S. 171, 176; *Hadacheck* v. *Sebastian,* 239 U. S. 394, 414.

[60] The population of Ewing Township, located near the City of Trenton, was 10,146 according to the census of 1940.  Sixteenth Census of the United States, Population, Vol. 1, 674.

[61] In *Thomas* v. *Collins,* 323 U. S. 516, 530, it was said that the preferred place given in our scheme to the great democratic freedoms secured by the First Amendment gives them "a sanctity and a sanction not permitting dubious intrusions."  Cf. Remonstrance, Par. 3, 9. And in other cases it has been held that the usual presumption of constitutionality will not work to save such legislative excursions in this field.  *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152, note 4; see Wechsler, Stone and the Constitution (1946) 46 Col. L. Rev. 764, 795 *et seq.*

Apart from the Court's admission that New Jersey's present action approaches the verge of her power, it would seem that a statute, ordinance or resolution which on its face singles out one sect only by name for enjoyment of the same advantages as public schools or their stu-

Two great drives are constantly in motion to abridge, in the name of education, the complete division of religion and civil authority which our forefathers made. One is to introduce religious education and observances into the public schools. The other, to obtain public funds for the aid and support of various private religious schools. See Johnson, The Legal Status of Church-State Relationships in the United States (1934); Thayer, Religion in Public Education (1947); Note (1941) 50 Yale L. J. 917. In my opinion both avenues were closed by the Constitution. Neither should be opened by this Court. The matter is not one of quantity, to be measured by the amount of money expended. Now as in Madison's day it is one of principle, to keep separate the separate spheres as the First Amendment drew them; to prevent the first experiment upon our liberties; and to keep the question from becoming entangled in corrosive precedents. We should not be less strict to keep strong and untarnished the one side of the shield of religious freedom than we have been of the other.

The judgment should be reversed.

### APPENDIX.

#### MEMORIAL AND REMONSTRANCE AGAINST RELIGIOUS ASSESSMENTS.

To the Honorable the General Assembly

OF

the Commonwealth of Virginia.

A Memorial and Remonstrance.

We, the subscribers, citizens of the said Commonwealth, having taken into serious consideration, a Bill printed by order of the last Session of General Assembly, entitled "A

---

dents, should be held discriminatory on its face by virtue of that fact alone, unless it were positively shown that no other sects sought or were available to receive the same advantages.

Bill establishing a provision for Teachers of the Christian Religion," and conceiving that the same, if finally armed with the sanctions of a law, will be a dangerous abuse of power, are bound as faithful members of a free State, to remonstrate against it, and to declare the reasons by which we are determined. We remonstrate against the said Bill,

1. Because we hold it for a fundamental and undeniable truth, "that Religion or the duty which we owe to our Creator and the Manner of discharging it, can be directed only by reason and conviction, not by force or violence." [1] The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable; because the opinions of men, depending only on the evidence contemplated by their own minds, cannot follow the dictates of other men: It is unalienable also; because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him. This duty is precedent both in order of time and degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governor of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the general authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no man's right is abridged by the institution of Civil Society, and that Religion is wholly exempt from its cognizance.

---

[1] Decl. Rights, Art: 16.   [Note in the original.]

True it is, that no other rule exists, by which any question which may divide a Society, can be ultimately determined, but the will of the majority; but it is also true, that the majority may trespass on the rights of the minority.

2. Because if religion be exempt from the authority of the Society at large, still less can it be subject to that of the Legislative Body. The latter are but the creatures and vicegerents of the former. Their jurisdiction is both derivative and limited: it is limited with regard to the co-ordinate departments, more necessarily is it limited with regard to the constituents. The preservation of a free government requires not merely, that the metes and bounds which separate each department of power may be invariably maintained; but more especially, that neither of them be suffered to overleap the great Barrier which defends the rights of the people. The Rulers who are guilty of such an encroachment, exceed the commission from which they derive their authority, and are Tyrants. The People who submit to it are governed by laws made neither by themselves, nor by an authority derived from them, and are slaves.

3. Because, it is proper to take alarm at the first experiment on our liberties. We hold this prudent jealousy to be the first duty of citizens, and one of [the] noblest characteristics of the late Revolution. The freemen of America did not wait till usurped power had strengthened itself by exercise, and entangled the question in precedents. They saw all the consequences in the principle, and they avoided the consequences by denying the principle. We revere this lesson too much, soon to forget it. Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? That the same authority which can force a citizen to contribute three pence

only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?

4. Because, the bill violates that equality which ought to be the basis of every law, and which is more indispensible, in proportion as the validity or expediency of any law is more liable to be impeached. If "all men are by nature equally free and independent,"[1] all men are to be considered as entering into Society on equal conditions; as relinquishing no more, and therefore retaining no less, one than another, of their natural rights. Above all are they to be considered as retaining an "*equal* title to the free exercise of Religion according to the dictates of conscience"[2] Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us. If this freedom be abused, it is an offence against God, not against man: To God, therefore, not to men, must an account of it be rendered. As the Bill violates equality by subjecting some to peculiar burdens; so it violates the same principle, by granting to others peculiar exemptions. Are the Quakers and Menonists the only sects who think a compulsive support of their religions unnecessary and unwarantable? Can their piety alone be intrusted with the care of public worship? Ought their Religions to be endowed above all others, with extraordinary privileges, by which proselytes may be enticed from all others? We think too favorably of the justice and good sense of these denominations, to believe that they either covet preeminencies over their fellow citizens, or that they will be seduced by them, from the common opposition to the measure.

---

[1] Decl. Rights, Art. 1.  [Note in the original.]

[2] Art: 16.  [Note in the original.]

5. Because the bill implies either that the Civil Magistrate is a competent Judge of Religious truth; or that he may employ Religion as an engine of Civil policy. The first is an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world: The second an unhallowed perversion of the means of salvation.

6. Because the establishment proposed by the Bill is not requisite for the support of the Christian Religion. To say that it is, is a contradiction to the Christian Religion itself; for every page of it disavows a dependence on the powers of this world: it is a contradiction to fact; for it is known that this Religion both existed and flourished, not only without the support of human laws, but in spite of every opposition from them; and not only during the period of miraculous aid, but long after it had been left to its own evidence, and the ordinary care of Providence: Nay, it is a contradiction in terms; for a Religion not invented by human policy, must have pre-existed and been supported, before it was established by human policy. It is moreover to weaken in those who profess this Religion a pious confidence in its innate excellence, and the patronage of its Author; and to foster in those who still reject it, a suspicion that its friends are too conscious of its fallacies, to trust it to its own merits.

7. Because experience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation. During almost fifteen centuries, has the legal establishment of Christianity been on trial. What have been its fruits? More or less in all places, pride and indolence in the Clergy; ignorance and servility in the laity; in both, superstition, bigotry and persecution. Enquire of the Teachers of Christianity for the ages in which it appeared in its greatest lustre; those of every sect, point to the ages prior

to its incorporation with Civil policy. Propose a restoration of this primitive state in which its Teachers depended on the voluntary rewards of their flocks; many of them predict its downfall. On which side ought their testimony to have greatest weight, when for or when against their interest?

8. Because the establishment in question is not necessary for the support of Civil Government. If it be urged as necessary for the support of Civil Government only as it is a means of supporting Religion, and it be not necessary for the latter purpose, it cannot be necessary for the former. If Religion be not within [the] cognizance of Civil Government, how can its legal establishment be said to be necessary to civil Government? What influence in fact have ecclesiastical establishments had on Civil Society? In some instances they have been seen to erect a spiritual tyranny on the ruins of Civil authority; in many instances they have been seen upholding the thrones of political tyranny; in no instance have they been seen the guardians of the liberties of the people. Rulers who wished to subvert the public liberty, may have found an established clergy convenient auxiliaries. A just government, instituted to secure & perpetuate it, needs them not. Such a government will be best supported by protecting every citizen in the enjoyment of his Religion with the same equal hand which protects his person and his property; by neither invading the equal rights of any Sect, nor suffering any Sect to invade those of another.

9. Because the proposed establishment is a departure from that generous policy, which, offering an asylum to the persecuted and oppressed of every Nation and Religion, promised a lustre to our country, and an accession to the number of its citizens. What a melancholy mark is the Bill of sudden degeneracy? Instead of holding forth an asylum to the persecuted, it is itself a signal

of persecution. It degrades from the equal rank of Citizens all those whose opinions in Religion do not bend to those of the Legislative authority. Distant as it may be, in its present form, from the Inquisition it differs from it only in degree. The one is the first step, the other the last in the career of intolerance. The magnanimous sufferer under this cruel scourge in foreign Regions, must view the Bill as a Beacon on our Coast, warning. him to seek some other haven, where liberty and philanthrophy in their due extent may offer a more certain repose from his troubles.

10. Because, it will have a like tendency to banish our Citizens. The allurements presented by other situations are every day thinning their number. To superadd a fresh motive to emigration, by revoking the liberty which they now enjoy, would be the same species of folly which has dishonoured and depopulated flourishing kingdoms.

11. Because, it will destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced amongst its several sects. Torrents of blood have been spilt in the old world, by vain attempts of the secular arm to extinguish Religious discord, by proscribing all difference in Religious opinions. Time has at length revealed the true remedy. Every relaxation of narrow and rigorous policy, wherever it has been tried, has been found to assuage the disease. The American Theatre has exhibited proofs, that equal and compleat liberty, if it does not wholly eradicate it, sufficiently destroys its malignant influence on the health and prosperity of the State. If with the salutary effects of this system under our own eyes, we begin to contract the bonds of Religious freedom, we know no name· that will too severely reproach our folly. At least let warning be taken at the first fruits of the threatened innovation. The very appearance of the Bill has transformed that "Chris-

tian forbearance,[1] love and charity," which of late mutually prevailed, into animosities and jealousies, which may not soon be appeased. What mischiefs may not be dreaded should this enemy to the public quiet be armed with the force of a law?

12. Because, the policy of the bill is adverse to the diffusion of the light of Christianity. The first wish of those who enjoy this precious gift, ought to be that it may be imparted to the whole race of mankind. Compare the number of those who have as yet received it with the number still remaining under the dominion of false Religions; and how small is the former! Does the policy of the Bill tend to lessen the disproportion? No; it at once discourages those who are strangers to the light of [revelation] from coming into the Region of it; and countenances, by example the nations who continue in darkness, in shutting out those who might convey it to them. Instead of levelling as far as possible, every obstacle to the victorious progress of truth, the Bill with an ignoble and unchristian timidity would circumscribe it, with a wall of defence, against the encroachments of error.

13. Because attempts to enforce by legal sanctions, acts obnoxious to so great a proportion of Citizens, tend to enervate the laws in general, and to slacken the bands of Society. If it be difficult to execute any law which is not generally deemed necessary or salutary, what must be the case where it is deemed invalid and dangerous? and what may be the effect of so striking an example of impotency in the Government, on its general authority.

14. Because a measure of such singular magnitude and delicacy ought not to be imposed, without the clearest evidence that it is called for by a majority of citizens: and no satisfactory method is yet proposed by which the voice of the majority in this case may be determined, or its influence secured. "The people of the respective counties

---

[1] Art. 16.   [Note in the original.]

are indeed requested to signify their opinion respecting the adoption of the Bill to the next Session of Assembly." But the representation must be made equal, before the voice either of the Representatives or of the Counties, will be that of the people. Our hope is that neither of the former will, after due consideration, espouse the dangerous principle of the Bill. Should the event disappoint us, it will still leave us in full confidence, that a fair appeal to the latter will reverse the sentence against our liberties.

15. Because, finally, "the equal right of every citizen to the free exercise of his Religion according to the dictates of conscience" is held by the same tenure with all our other rights. If we recur to its origin, it is equally the gift of nature; if we weigh its importance, it cannot be less dear to us; if we consult the Declaration of those rights which pertain to the good people of Virginia, as the "basis and foundation of Government,"[1] it is enumerated with equal solemnity, or rather studied emphasis. Either then, we must say, that the will of the Legislature is the only measure of their authority; and that in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: Either we must say, that they may controul the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary Powers of the State; nay that they may despoil us of our very right of suffrage, and erect themselves into an independent and hereditary assembly: or we must say, that they have no authority to enact into law the Bill under consideration. We the subscribers say, that the General Assembly of this Commonwealth have no such authority: And that no effort may be omitted on our part against so dangerous an usurpation, we oppose to it, this remonstrance; earnestly praying, as we are in duty

[1] Decl. Rights-title.   [Note in the original.]

72

bound, that the Supreme Lawgiver of the Universe, by illuminating those to whom it is addressed, may on the one hand, turn their councils from every act which would affront his holy prerogative, or violate the trust committed to them: and on the other, guide them into every measure which may be worthy of his [blessing, may re]dound to their own praise, and may establish more firmly the liberties, the prosperity, and the Happiness of the Commonwealth.

II Madison, 183–191.

## SUPPLEMENTAL APPENDIX.

### A BILL ESTABLISHING A PROVISION FOR TEACHERS OF THE CHRISTIAN RELIGION.

Whereas the general diffusion of Christian knowledge hath a natural tendency to correct the morals of men, restrain their vices, and preserve the peace of society; which cannot be effected without a competent provision for learned teachers, who may be thereby enabled to devote their time and attention to the duty of instructing such citizens, as from their circumstances and want of education, cannot otherwise attain such knowledge; and it is judged that such provision may be made by the Legislature, without counteracting the liberal principle heretofore adopted and intended to be preserved by abolishing all distinctions of pre-eminence amongst the different societies or communities of Christians;

*Be it therefore enacted by the General Assembly,* That for the support of Christian teachers,    per centum on the amount, or    in the pound on the sum payable for tax on the property within this Commonwealth, is hereby assessed, and shall be paid by every person chargeable with the said tax at the time the same shall become due; and the Sheriffs of the several Counties shall have power to levy and collect the same in the same manner and under

the like restrictions and limitations, as are or may be prescribed by the laws for raising the Revenues of this State.

*And be it enacted,* That for every sum so paid, the Sheriff or Collector shall give a receipt, expressing therein to what society of Christians the person from whom he may receive the same shall direct the money to be paid, keeping a distinct account thereof in his books. The Sheriff of every County, shall, on or before the      day of           in every year, return to the Court, upon oath, two alphabetical lists of the payments to him made, distinguishing in columns opposite to the names of the persons who shall have paid the same, the society to which the money so paid was by them appropriated; and one column for the names where no appropriation shall be made.   One of which lists, after being recorded in a book to be kept for that purpose, shall be filed by the Clerk in his office; the other shall by the Sheriff be fixed up in the Court-house, there to remain for the inspection of all concerned.   And the Sheriff, after deducting five per centum for the collection, shall forthwith pay to such person or persons as shall be appointed to receive the same by the Vestry, Elders, or Directors, however denominated of each such society, the sum so stated to be due to that society; or in default thereof, upon the motion of such person or persons to the next or any succeeding Court, execution shall be awarded for the same against the Sheriff and his security, his and their executors or administrators; provided that ten days previous notice be given of such motion.   And upon every such execution, the Officer serving the same shall proceed to immediate sale of the estate taken, and shall not accept of security for payment at the end of three months, nor to have the goods forthcoming at the day of sale; for his better direction wherein, the Clerk shall endorse upon every such execution that no security of any kind shall be taken.

*And be it further enacted,* That the money to be raised by virtue of this Act, shall be by the Vestries, Elders, or Directors of each religious society, appropriated to a provision for a Minister or Teacher of the Gospel of their denomination, or the providing places of divine worship, and to none other use whatsoever; except in the denominations of Quakers and Menonists, who may receive what is collected from their members, and place it in their general fund, to be disposed of in a manner which they shall think best calculated to promote their particular mode of worship.

*And be it enacted,* That all sums which at the time of payment to the Sheriff or Collector may not be appropriated by the person paying the same, shall be accounted for with the Court in manner as by this Act is directed; and after deducting for his collection, the Sheriff shall pay the amount thereof (upon account certified by the Court to the Auditors of Public Accounts, and by them to the Treasurer) into the public Treasury, to be disposed of under the direction of the General Assembly, for the encouragement of seminaries of learning within the Counties whence such sums shall arise, and to no other use or purpose whatsoever.

THIS Act shall commence, and be in force, from and after the          day of                     in the year

*A Copy from the Engrossed Bill.*

JOHN BECKLEY, C. H. D.

*Washington Mss. (Papers of George Washington, Vol. 231); Library of Congress.\**

---

\*This copy of the Assessment Bill is from one of the handbills which on December 24, 1784, when the third reading of the bill was postponed, were ordered distributed to the Virginia counties by the House of Delegates. See Journal of the Virginia House of Delegates, December 24, 1784; Eckenrode, 102–103. The bill is therefore in its final form, for it never again reached the floor of the House. Eckenrode, 113.