THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* SAMUEL ROTH and PAULINE ROTH, Defendants.

Court of General Sessions of County of New York, May 18, 1955.

*Frank S. Hogan, District Attorney (Carroll W. Hayes* of counsel), for plaintiff.

*Nicholas Atlas* for defendants.

*Emanuel Redfield* for Civil Liberties Union, *amicus curiæ.*

SCHURMAN, J.   Although quotations never help, if used to take the place of thought, nonetheless occasions arise when what others have said helps the writer to determine, if it be challenged, whether the method elected to be used to detect crime is appropriate to the occasion and in season with the time.

And so, at the outset, I quote from the Record of the Association of the Bar of the City of New York (Vol. 10, No. 4, April, 1955) and take from page 158, reference to action had at the stated meeting in March, which is worded as follows: " The following resolution was adopted: Resolved, that The Association of the Bar of the City of New York deplores and condemns the attempts of any individual or group, private or public, to interfere in any manner with the publication, circulation, or reading of any published matter, other than by means of regular applicable statutory procedures and standards; this resolution does not purport to limit the expression of views by any individual or group concerning any published matter."

Such also, one may assume, is the attitude of the New York County Lawyers' Association.   This appears from an address made January 11, 1955, by the retiring chairman of its special committee on civil rights.   Thus, to quote from the last page of a reprint of that address (as distributed by a group of friends), the speaker said: " Our Committee has studied and reported and urged action on the question of unlawful searches and seizures.   Our Committee has fought the good fight.   It will carry on."

Reference is made to the Association of the Bar of the City of New York and to the New York County Lawyers' Association not because they stood alone in the defense of civil rights and not because their defense of those rights was more effective than that of other associations of lawyers.

On the contrary, the Association of the Bar of the City of New York and the New York County Lawyers' Association are chosen in part because they are in New York County and in part also because most members of the Bar would regard these two associations as among the leaders of sound and realistic thinking, on legal matters, in New York County.

And sound thinking is essential to-day.

Destiny has put our generation in a convulsive epoch of history. Iron curtains have come down to hide many majestic civilizations. Whether they have been wholly destroyed we know not. But this we do know. A tragedy is unfolding before us where the dignity of man is made to wither into empty words while his rights are consumed and he himself becomes a slave.

Wherefore, it is fitting to recall that immunity from searches and seizures, save where accomplished under the law, is one of the foundations of our American way of life.

This, of course, is merely to state the obvious; but a convenient summary of the importance, underlying the apparent, is to be found in sources and documents illustrating the American revolution (1764–1788) and the formation of the Federal Constitution selected and edited by S. E. Morison and published in 1923, by the Oxford University Press.

From it I shall refer, for the present, to two instances only. These are: *Proceedings of the Town of Boston,* October–November 1772, which are printed at pages 87 to 96. And from it I quote briefly from page 92: " Thus our houses and even our bed chambers are exposed to be ransacked, our boxes, chests and trunks broke open, ravaged and plundered by wretches  *  *  * whenever they are pleased to say they suspect there are in the house wares, etc., for which the dutys have not been paid."

And I quote also from the Virginia Bill of Rights which was adopted at the capitol in the city of Williamsburg on Monday the 6th of May, 1776. This is printed at pages 149 to 151 but I quote only article 10 at page 150, which reads: " 10. That general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offence is not particularly described and supported by evidence, are grievous and oppressive, and ought not to be granted."

The principles expressed in these words live today and they are as vital to our well-being as they were 250 years ago.

Their importance is recognized in section 12 of Article I of the Constitution of the State of New York which, in its first paragraph, provides: " The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

And to the same effect is the Fourth Amendment to the Constitution of the United States, which is a part of the Bill of Rights and which the Fourteenth Amendment now applies as a restraint against the several States. (*Everson* v. *Board of Education,* 330 U. S. 1.)

Article IV of the amendments reads, as follows: " The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Wherefore, history comes to our aid and casts light on the background of sections 791–813 of the Code of Criminal Procedure.

For, in New York State, it is these statutes to which we look for a statement of the law on search warrants. And these sections serve as a guide when questions are raised as to their validity or the propriety of action taken under them.

It may be that sections 793, 795 and 803 are of particular interest in the present circumstances.

Section 793 limits the issuance of search warrants and states: " A search warrant cannot be issued, but upon probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched."

Section 795 deals with the contents of supporting affidavits. It reads, as follows: " The depositions must set forth the facts tending to establish the grounds of the application, or probable cause for believing that they exist."

And finally section 803 specifies the officer taking any property, under a search warrant, must give a detailed receipt for it.

Wherefore, it is timely first to examine the affidavit tendered as an appropriate support to the search warrant.

Only one such affidavit was delivered to the writer. It is verified April 13, 1954. In it the affiant states: " Reports of detectives attached to the office of the District Attorney, New York County, and of police officers acting in collaboration with and under the general supervision of our office, establishes ". And then follow three paragraphs alleging violations of law by the defendant, Samuel Roth, at 110 Lafayette Street in New York City.

The affidavit then moves on, as follows: "Based upon the said detectives and police officers' report, there is probable cause to believe that there is in the possession of said Samuel Roth, Seven Sirens Press, Inc., Golden Rood Books, Garguantua Books, their employees and associates, with the intent that it be used as the means of committing public offenses, and with the purpose of its being concealed, personal property, to wit." Here follow three paragraphs, designated A, B and C to which brief reference is appropriate.

Thus paragraph A refers to the records "listing and setting forth the mode of operation" that is used in the "printing, binding, procuring, distribution and sale of the obscene literature in Roth's business.

Paragraph B refers to "invoices, ledgers, withholding records, payroll records and other papers and records pertaining to any and all of the printing establishments that the above person and companies are connected with, in the procurement, distribution and sale of obscene literature."

Paragraph C refers to "Records of accounts" and to "check and bank records;" and, if the writer may be permitted to summarize, generally to the paraphernalia used by Samuel Roth and the companies in the conduct of their enterprises.

This somewhat detailed analysis of the supporting affidavit is made because its necessary effect, so the writer believes, is to demonstrate that the search warrant is founded on a base that is too fragile for its support.

And so the court, despite its distaste for the vulgar and the obscene, has no choice in the present matter.

Wherefore the search warrant herein, dated April 13, 1954, is vacated and set aside and the property listed in the inventory of property taken under such search warrant (which inventory is typewritten and consists of pages numbered 1 to 5) is ordered to be returned in its entirety to Samuel Roth (or to any other person or corporation from whom it was taken).

The same ruling is made on the search warrant, also dated April 13, 1954, that purported to authorize a search of the person of Samuel Roth and Pauline Roth in the home of Samuel Roth at 11 West 81st Street, New York. In respect to such warrant, the property taken and now ordered to be returned is listed in the inventory of property taken under search warrant dated April 13, 1954, from premises 11 West 81st Street, New York, N. Y. This inventory consists of one typewritten page only; and the search warrant, now vacated, appears to be founded on the

affidavit, verified April 13, 1954 (to which reference was earlier made), and especially to paragraphs A, B and C of that affidavit, all of which have been discussed.

Moreover, having read the stenographic minutes of the Grand Jury herein, defendant's motion to inspect them is granted; and finally, for the same reason, the motion by defendant to dismiss the charge of assault in the third degree is in all respects granted.